**NATIONAL LABOR RELATIONS BOARD
v. SOUTHWESTERN GREYHOUND
LINES, Inc. (GREYHOUND EM-
PLOYEES UNION, Intervener).**

No. 521.

Circuit Court of Appeals, Eighth Circuit.

March 30, 1942.

William Strong, of Washington, D. C., Atty., National Labor Relations Board (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Lewis M. Gill, and Ramey Donovan, all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for petitioner.

Ivan Bowen, of Minneapolis, Minn. (Mark McGee and Samuels, Foster, Brown & McGee, all of Fort Worth, Tex., on the brief), for respondent.

Karl H. Mueller, of Fort Worth, Tex., (Harold E. Mueller, of Fort Worth, Tex., on the brief), for intervener.

Before SANBORN and JOHNSEN, Circuit Judges, and NORDBYE, District Judge.

JOHNSEN, Circuit Judge.

The National Labor Relations Board has filed a petition under section 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq., for the enforcement of its order of March 28, 1940, against Southwestern Greyhound Lines, Inc., and we have granted leave to Greyhound Employees Union, referred to herein as GEU, to appear as intervener.

Two principal contentions are urged in resistance to the enforcement: (1) That the Board acted arbitrarily in requiring the employer to withdraw recognition from and to disestablish GEU as an employee bargaining representative under the Act; and (2) that the Board was without authority to require the employer to make reimbursement for the payroll deductions which had been made in favor of GEU, under written authorizations or orders executed by its employee-members. Two other objections raised also call for brief consideration.

On the first question, we think there is substantial evidence to support the finding and order of the Board.

The record shows that from 1933 to April 30, 1937, respondent sponsored among its employees an inside union, known as Employees Association of Southwestern Greyhound Lines, Inc. No attempt is made here to deny that this union was company created, supported and dominated. It was a parallel organization with those ordered disestablished in National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, and National Labor Relations Board v. Pacific Greyhound Lines, Inc., 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838.

The Association was run by a group of committeemen who held periodical meetings at company expense. After the decision of the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, upholding the constitutionality of the Act, Clayton, one of the committeemen, conferred with respondent's officials about organizing another inside union, which he claimed he had also previously discussed with some of the other employees. Several outside labor organizations, including the Brotherhood of Railroad Trainmen, were at that time apparently attempting to institute organizational activities, and Clayton prepared a letter to the other general committeemen, in respondent's office, which the officials approved and which was mailed at company expense. This letter outlined an organization plan and suggested that action be taken with reference to it as soon as possible, "so we may get this under way before some of the labor unions get started with their organization plans". The company paid Clayton his wages for the four days time he had spent in making the trip to respondent's office and in holding conferences with its officials, and reimbursed him for his expenses.

Clayton also called Ellis, the chairman of the Association, by long distance telephone, from the company office and at company expense, to discuss the matter, and Ellis got out a letter, on company stationery and at company expense, calling a meeting of the committeemen on April 26, 1937, for the purpose of creating a new organization, and requesting them "not in any way to align themselves with any organization, and * * * to request their men to stand by until a new organization is effected by the members of the present organization".

The meeting was held from April 26 to April 30, 1937, in a hotel room across from respondent's home office in Fort Worth, Texas, and, throughout the course of the meeting, various conversations about the progress of the organizational efforts were engaged in with respondent's officials. A constitution and some by-laws were drawn up and approved by the committeemen. The committeemen had assumed that respondent would pay their expenses and lost wages, as it had been doing in the past in connection with meetings of the Association. When they were informed by an attorney for the Board that the company had no right to furnish any such financial assistance, they attempted to induce the company or its president to make them a loan, and finally borrowed $1,000 at a Fort Worth bank, on a personal note signed by eleven of the committeemen. Ellis, without authority from the company, declared to the other committeemen that he felt certain the company would pay the note, if the organization failed to materialize.

After the committeemen had finished preparing the constitution and by-laws for

the new organization, which was to be known as Greyhound Employees, Inc., respondent's president, on April 30, 1937, which was the last day of their meeting, addressed a letter to the committeemen, declaring that "all recognition * * * is hereby withdrawn from the representatives of the Employees Association as presently constituted". A copy of this letter was posted by some of the committeemen on the company's bulletin boards in a number of the cities where respondent operated, together with a solicitation to join the new organization.

Ellis and the other committeemen of the old Association remained in charge of the new organization. A number of membership meetings were held, but the constitution and by-laws were never submitted to the employees for approval or adoption. Some time in May, 1937, Ellis, "with the knowledge of several of the other men", changed the name of the organization from Greyhound Employees, Inc. to Greyhound Employees Union. It continued thereafter to be known as Greyhound Employees Union. Under that name, it requested respondent to recognize it as the exclusive bargaining representative of the employees, but respondent did not purport to grant the request at the time, because the Brotherhood of Railroad Trainmen was then also claiming to represent a majority of respondent's bus drivers. In November, 1937, respondent permitted GEU to file written authorizations or orders, executed by its employee-members, for the deduction of $1.50 per month from their wages, in payment of GEU dues. It refused to enter into or recognize a similar arrangement on behalf of BRT. This "check-off" in favor of GEU was continued in effect until the hearing of this case before the Board.

In December, 1937, BRT filed charges before the Board alleging that GEU was a company sponsored and dominated union. The chairman and the secretary of GEU, together with two of the other committeemen who had participated in the meeting at Fort Worth at which Greyhound Employees, Inc., or GEU as it was immediately afterwards called, had been formed, then employed an attorney to draft a new constitution and by-laws for GEU. These were to become effective upon ratification by a majority of those who had paid dues to GEU for the month of December, 1937. The constitution and by-laws were approved by a majority of the old members of GEU in January, 1938, and nominations and election of committeemen were thereafter held. Ellis was again elected chairman, as he had been of the old Association, and as he had continued of Greyhound Employees, Inc., or GEU, after the organization meeting at Fort Worth in April, 1937. At a meeting of the committeemen called by Ellis, on May 2, 1938, GEU assumed payment of the $1,000 note which the old committeemen had signed at Fort Worth in April, 1937. In August, 1938, respondent recognized GEU as the exclusive bargaining representative of its employees.

■ It is argued here that, after the adoption of its new constitution and by-laws, in January, 1938, GEU was in the position of a completely independent union, which the Board had no right to order disestablished. We think the facts which we have recited, with other circumstances appearing in the record, which it is unnecessary to detail here, justified the Board in treating GEU, for purposes of effectuating the policies of the Act, as not being "free from the congenital defect of employer influence and support." National Labor Relations Board v. Rath Packing Co., 8 Cir., 123 F.2d 684, 685. Respondent had not purported to make the slightest effort "to wipe the slate clean" (National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 598, 61 S.Ct. 358, 365, 85 L.Ed. 368), as to any aspect of the situation until the committeemen of the old Association had set up the structure and taken the throttle of the successor organization. Only after this had been done was the declaration made by the company that "all recognition * * * is hereby withdrawn from the representatives of the Employees Association as presently constituted". The Board calls attention to the fact also that recognition purported to have been withdrawn from the Association only "as presently constituted".

■ Respondent clearly had lent encouragement and assistance to the formation of Greyhound Employees, Inc., or GEU, and when the relationship of the committeemen to respondent's officials is viewed, in the light of their repeated conferences about the organization plans and their request for a financial loan from the company, the implication is hardly escapable that one of the primary concerns and

objects of the committeemen had been to try to satisfy the company. But whether the intrusion of the company actually dominated the situation or not is unimportant here. "In applying the statutory test of independence it is immaterial that * * * any company interference in the administration of the plan had been incidental rather than fundamental and with good motives." National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 251, 60 S.Ct. 203, 208, 84 L.Ed. 219.

If it was intended that the new constitution and by-laws which were drawn up in December, 1937, were to constitute GEU as a different organization, there is nothing in the record to indicate that the company ever had purported to make any effort to wipe the slate clean on the old GEU. While it is true that up to that time GEU had not been recognized formally as the exclusive bargaining representative of the employees, the company nevertheless had accorded it a definite status by entering into special relationships with it, such as granting it a payroll deduction privilege. In addition, only dues-paying members of the old GEU were allowed to vote on the adoption of the new constitution and by-laws. The leaders in the old GEU were instrumental in having the submission made. The old GEU name was retained. Payroll deductions were to continue under the authorizations or orders which had been executed on behalf of the old GEU. There was nothing to indicate controllingly to the casual employee that the organization with its new constitution and by-laws could or would bear any different relationship to the company than had the old GEU from the time of its formation at Fort Worth in April, 1937.

█ Whether a new organization could be said to have been created, as a matter of legal technicality, would be unimportant, for the Board was in any event not required to treat the situation as having been changed, in its relations to the object and policies of the Act. "We cannot assume that the employees * * * will have the complete freedom of choice which the Act contemplates where the effect of the unfair labor practice is not completely dissipated. The Board not the courts determines under this statutory scheme how the effect of unfair labor practices may be expunged." National Labor Relations Board v. Link-Belt Co., supra, at page 600 of 311 U.S.,

at page 366 of 61 S.Ct., 85 L.Ed. 368. See also H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309, and National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 60 S.Ct. 307, 84 L.Ed. 396.

█ The second question presented, that of the authority of the Board, where it disestablishes a union as an improper bargaining representative under the Act, to require an employer to reimburse the employees for the payroll deductions which have been made in favor of such a union, under written authorizations or orders executed by its employee-members, has not been the subject of express decision by the Supreme Court. The question was presented in National Labor Relations Board v. Virginia Electric & Power Co., 62 S.Ct. 344, 86 L.Ed. ——, but, under the disposition made of that case, the court did not deem it necessary to pass upon it.

In Republic Steel Corporation v. National Labor Relations Board, 311 U.S. 7, 11, 12, 61 S.Ct. 77, 79, 85 L.Ed. 6, however, it was declared: "We do not think that Congress intended to vest in the Board a virtually unlimited discretion to devise punitive measures, and thus to prescribe penalties or fines which the Board may think would effectuate the policies of the Act. * * * In that view, it is not enough to justify the Board's requirements to say that they would have the effect of deterring persons from violating the Act. That argument proves too much, for if such a deterrent effect is sufficient to sustain an order of the Board, it would be free to set up any system of penalties which it would deem adequate to that end."

In every case in which the question of reimbursement for check-offs has been presented to the Circuit Courts of Appeal, the provision for such affirmative action in the Board's order appears to have been refused enforcement. See National Labor Relations Board v. U. S. Truck Co., Inc., 6 Cir., 124 F.2d 887; National Labor Relations Board v. Continental Oil Co., 10 Cir., 121 F.2d 120, 125; A. E. Staley Mfg. Co. v. National Labor Relations Board, 7 Cir., 117 F.2d 868, 879; National Labor Relations Board v. West Kentucky Coal Co., 6 Cir., 116 F.2d 816; Western Union Telegraph Co. v. National Labor Relations Board, 2 Cir., 113 F.2d 992, 997; Kansas City Power & Light Co. v. National Labor Relations Board, 8 Cir., 111 F.2d 340, 347,

348; National Labor Relations Board v. J. Greenebaum Tanning Co., 7 Cir., 110 F.2d 984, 988. Some of these decisions declare flatly that such a requirement in any case is punitive and not remedial, and hence is beyond the power of the Board under the Act. Others do not attempt to pass upon the question generally, but merely hold the Board's action to have been arbitrary and punitive under the facts of the particular case.

In Kansas City Power & Light Co. v. National Labor Relations Board, supra, at page 348 of 111 F.2d, this Court said: "There may be situations which would justify such an order. This is not one. * * * There is no basis in the evidence or in any situation revealed by the evidence for such an order. It has, under the circumstances here, no relation to the effectuation of any policies of the Act."

What was said in the Kansas City Power & Light Co. case is equally applicable to the circumstances of this case, and the expression there made is as far as it is necessary and perhaps proper for us to go here. There is no possible basis under the evidence for holding that the company exercised any discrimination against employees because of the manner in which they paid their union dues. There is nothing to indicate that the company instituted or insisted upon the check-off system, or that an employee was not free to pay his dues direct, if he chose, or to revoke at any time the authorization or order for payroll deductions which he had executed. The basic evil in the whole situation which was entitled to correction was, not the mere manner of the payment of dues, but the fact that an employee should at all feel obligated to belong to an organization as to which the field had not been properly cleared for the exercise of that free choice which the Act contemplated should exist in the selection of a true bargaining representative.

In the absence of some more coercive circumstances than are contained in the record before us, which might be claimed to place the situation on a special ground,— if indeed any such special remedial ground can at all be held to exist under the Act— the Board's order for reimbursement of the dues collected by authorized payroll deductions on behalf of the union, in the general situation of this case, would appear to have no more validity than could an order which would require an employer to make reimbursement generally to the employees for all dues paid to a company-fostered union, no matter how they had been collected. In each case the basic unfair labor practice, as we have indicated, would be the failure to have afforded the employees the proper opportunity to select a true bargaining representative under the Act. As a deterrent, the latter requirement would certainly be much more effective than the former. As a general incident in an ordinary situation, such as is here presented, either would be purely penal.

We accordingly hold that this portion of the Board's order in the circumstances of the present case is in the nature of a penalty and cannot be legally enforced.

■ One of respondent's other contentions is directed at the form of the cease and desist and posting of notices provisions of the Board's order. These provisions are claimed to be violative of the rules in National Labor Relations Board v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 701, 85 L.Ed. 930. The Board has consented that the notices provision be modified to require respondent merely to state that it "will not engage in the conduct from which it is ordered to cease and desist", rather than that it will in effect cease and desist generally from any unfair labor practice under the Act. With this modification in the posted notices, we think the provisions of the Board's order are proper.

■■ The only other contention that requires consideration is the claim that the Board acted arbitrarily and oppressively in transferring the proceedings from Fort Worth, Texas, and in holding the hearing at Kansas City, Missouri. Fort Worth is the headquarters of the Board's Sixteenth Region, and Kansas City is the headquarters of its Seventeenth Region. Respondent's home office is located in Fort Worth, but its bus operations extend into Kansas City. Part of the unfair labor practices charged occurred in the Seventeenth Region. Of the twenty-one witnesses who testified at the hearing, fifteen resided nearer Kansas City than Fort Worth. Six actually lived in Kansas City, and only three resided in Fort Worth.

Respondent does not allege that it was unable to produce all of its desired witnesses or records at the Kansas City hearing, and so was denied the opportunity for a full, fair hearing. Nor does it show that it was unduly burdensome to it, finan-

888

cially or otherwise, to attend the hearing and have its evidence available at Kansas City. The most that the record can be said to establish is some lack of convenience and some increase of expense—neither of which can be said to have been oppressive. The Board in fixing a place for a hearing, should, of course, give due consideration to the situation of the respondent, but it is also entitled to exercise its sound discretion in the interest and convenience of all the parties involved or affected by the proceeding. We do not believe that in the present situation the Board has abused its discretion or has in any material way prejudiced or placed any unwarranted burden upon respondent.

As indicated above, the provision of the Board's order requiring respondent to reimburse its employees for the payroll deductions which were made will be set aside. The provision for the posting of notices will be modified to require respondent only to state that it "will not engage in the conduct from which it is ordered to cease and desist". The other provisions of the Board's order will be enforced as they stand.