The NORTH AMERICAN SOCCER
LEAGUE, etc., et al., Petitioners
Cross-Respondents,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent
Cross-Petitioner.

No. 79–2069.

United States Court of Appeals,
Fifth Circuit.

March 21, 1980.

Rehearing and Rehearing En Banc
Denied April 23, 1980.

vin, Washington, D. C., Garon, Brener & McNeely, Herbert J. Garon, New Orleans, La., for petitioners cross-respondents.

Elliott Moore and John D. Burgoyne, Deputy Associates, Gen. Counsel, Washington, D. C., for NLRB.

Ed Garvey, Washington, D. C., Jerry L. Gardner, Jr., New Orleans, La., for North American Soccer League Players Assn.

Before MORGAN, RONEY and GARZA, Circuit Judges.

RONEY, Circuit Judge:

The correct collective bargaining unit for the players in the North American Soccer League is at issue in this case. Contrary to our first impression, which was fostered by the knowledge that teams in the League compete against each other on the playing fields and for the hire of the best players, our review of the record reveals sufficient evidence to support the National Labor Relations Board's determination that the League and its member clubs are joint employers, and that a collective bargaining unit comprised of all NASL players on clubs based in the United States is appropriate. Finding petitioners' due process challenge to be without merit, we deny the petition for review and enforce the collective bargaining order on the cross-application of the Board.

The North American Soccer League is a non-profit association comprised of twenty-four member clubs.[1] The North American Soccer League Players Association, a labor organization, petitioned the NRLB for a

Danzansky, Dickey, Tydings, Quint & Gordon, Robert F. Rolnick, Edward R. Le-

1. The
 Atlanta Chiefs
 California Surf
 Chicago Sting
 Cosmos
 Dallas Tornado
 Detroit Express
 Edmonton Drillers
 Ft. Lauderdale Strikers
 Houston Hurricane
 L.A. Aztecs
 Memphis Rogues
 Minnesota Kicks
 N.E. Tea Men
 Philadelphia Fury

representation election among all NASL players. The Board found the League and its clubs to be joint employers and directed an election within a unit comprised of all the soccer players of United States clubs in the League. Excluded from the unit were players for the clubs based in Canada,[2] because the Board concluded its jurisdiction did not extend to those clubs as employers.

Players in the unit voted in favor of representation by the Association.[3] After the League and its clubs refused to bargain, the Board found them in violation of Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(1) and (5), and ordered collective bargaining.[4] The League and its member clubs petitioned this Court for review. The Board's cross-application seeks enforcement of that order.

 The settled law is not challenged on this petition for review. Where an em-ployer has assumed sufficient control over the working conditions of the employees of its franchisees or member-employers, the Board may require the employers to bargain jointly.[5] The Board is also empowered to decide in each case whether the employee unit requested is an appropriate unit for bargaining.[6] The Board's decision will not be set aside unless the unit is clearly inappropriate.[7] Thus the issues in this case are whether there is a joint employer relationship among the League and its member clubs, and if so, whether the designated bargaining unit of players is appropriate.

## JOINT EMPLOYERS

 Whether there is a joint employer relationship is "essentially a factual issue,"[8] and the Board's finding must be affirmed if supported by substantial evidence on the record as a whole.[9]

---

Portland Timbers
Rochester Lancers
San Diego Sockers
San Jose Earthquakes
Seattle Sounders
Tampa Bay Rowdies
Toronto Blizzards
Tulsa Roughnecks
Vancouver Whitecaps and
Washington Diplomats

2. The
Edmonton Drillers
Toronto Blizzards and
Vancouver Whitecaps

3. The vote was 271 for, 94 against.

4. The representation petition was filed on August 16, 1977, and hearings were held during the following month. On September 30, 1977, the case was transferred to the Board for decision pursuant to 29 C.F.R. § 102.67(h) (1977).

The Board issued its Decision and Direction of Election on June 30, 1978. *North American Soccer League*, 236 N.L.R.B. —— [No. 181] (1978). The petitioners' subsequent motion for reconsideration and reopening of the record was denied.

Elections were held between July 27 and August 4, 1978, resulting in the Association's certification on September 1, 1978 as exclusive representative of the unit found appropriate by the Board.

The Association's bargaining request was refused by the petitioners, and unfair labor prac-tice charges were filed with the Board on October 30, 1978. The Board granted a motion for summary judgment against the joint employers on April 30, 1979, ordering them to bargain collectively with the Association. *North American Soccer League*, 241 N.L.R.B. —— [No. 199] (1979).

5. *NLRB v. Zayre Corp.*, 424 F.2d 1159, 1164–65 (5th Cir. 1970); *Gallenkamp Stores Co. v. NLRB*, 402 F.2d 525, 528–31 (9th Cir. 1968); *NLRB v. Checker Cab Co.*, 367 F.2d 692, 696–98 (6th Cir. 1966), *cert. denied*, 385 U.S. 1008, 87 S.Ct. 715, 17 L.Ed.2d 546 (1967); *see Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964).

6. Section 9(b), N.L.R.A., 29 U.S.C.A. § 159(b); *see, e. g., NLRB v. J. M. Wood Mfg. Co.*, 466 F.2d 201, 202 (5th Cir. 1972), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1372, 35 L.Ed.2d 593 (1973).

7. *NLRB v. J. C. Penney Co.*, 559 F.2d 373, 375 (5th Cir. 1977).

8. *Boire v. Greyhound Corp.*, 376 U.S. at 481, 84 S.Ct. at 898.

9. *NLRB v. Greyhound Corp. (Southern Greyhound Lines Div.)*, 368 F.2d 778, 781 (5th Cir. 1966); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–64, 95 L.Ed. 456 (1951); *NLRB v. M. P. Building Corp.*, 411 F.2d 567, 568 (5th Cir. 1969).

██ The existence of a joint employer relationship depends on the control which one employer exercises, or potentially exercises, over the labor relations policy of the other.[10] In this case, the record supports the Board's finding that the League exercises a significant degree of control over essential aspects of the clubs' labor relations, including but not limited to the selection, retention, and termination of the players, the terms of individual player contracts, dispute resolution and player discipline. Furthermore, each club granted the NASL authority over not only its own labor relations but also, on its behalf, authority over the labor relations of the other member clubs. The evidence is set forth in detail in the Board's decision and need be only briefly recounted here. *North American Soccer League*, 236 N.L.R.B. ___ [No. 181].

The League's purpose is to promote the game of soccer through its supervision of competition among member clubs. Club activities are governed by the League constitution, and the regulations promulgated thereunder by a majority vote of the clubs. The commissioner, selected and compensated by the clubs, is the League's chief executive officer. A board of directors composed of one representative of each club assists him in managing the League.

The League's control over the clubs' labor relations begins with restrictions on the means by which players are acquired. An annual college draft is conducted by the commissioner pursuant to the regulations, and each club obtains exclusive negotiating rights to the players it selects. On the other hand, as the Board recognized, the League exercises less control over the acquisition of "free agent" players and players "on loan" from soccer clubs abroad.

The regulations govern interclub player trades and empower the commissioner to void trades not deemed to be in the best interest of the League. Termination of player contracts is conducted through a waiver system in accordance with procedures specified in the regulations.

The League also exercises considerable control over the contractual relationships between the clubs and their players. Before being permitted to participate in a North American Soccer League game, each player must sign a standard player contract adopted by the League. The contract governs the player's relationship with his club, requiring his compliance with club rules and the League constitution and regulations. Compensation is negotiated between the player and his club, and special provisions may be added to the contract. Significantly, however, the club must seek the permission of the commissioner before signing a contract which alters any terms of the standard contract.

Every player contract must be submitted to the commissioner, who is empowered to disapprove a contract deemed not in the best interest of the League. The commissioner's disapproval invalidates the contract. Disputes between a club and a player must be submitted to the commissioner for final and binding arbitration.

Control over player discipline is divided between the League and the clubs. The clubs enforce compliance with club rules relating to practices and also determine when a player will participate in a game. The League, through the commissioner, has broad power to discipline players for misconduct either on or off the playing field. Sanctions range from fines to suspension to termination of the player's contract.

Although we recognize that minor differences in the underlying facts might justify different findings on the joint employer

---

**10.** *Atwood Leasing Corp.*, 227 N.L.R.B. 1668, 1669 (1977); *Southland Corp.*, 170 N.L.R.B. 1332, 1334 (1968).

issue,[11] the record in this case supports the Board's factual finding of a joint employer relationship among the League and its constituent clubs.

■ Having argued against inclusion of the Canadian clubs in the NLRB proceeding, petitioners contend on appeal that their exclusion renders the Board's joint employer finding, encompassing 21 clubs, inconsistent with the existence of a 24-club League. The jurisdictional determination is not before us on appeal, however, and the Board's decision not to exercise jurisdiction over the Canadian clubs does not undermine the evidentiary base of its joint employer finding.

Even assuming the League and the clubs are joint employers, they contend that *Greenhoot, Inc.,* 205 N.L.R.B. 250 (1973), requires a finding of a separate joint employer relationship between the League and each of its clubs, and does not permit all the clubs to be lumped together with the League as joint employers. In *Greenhoot,* a building management company was found to be a joint employer separately with each building owner as to maintenance employees in the buildings covered by its contracts. The present case is clearly distinguishable, because here each soccer club exercises through its proportionate role in League management some control over the labor relations of other clubs. In *Greenhoot,* building owners did not exercise any control through the management company over the activities of other owners.

## APPROPRIATE UNIT

The joint employer relationship among the League and its member clubs having been established, the next issue is whether the leaguewide unit of players designated by the Board is appropriate. Here the Board's responsibility and the standard of review in this Court are important.

■ The Board is not required to choose *the most* appropriate bargaining unit, only to select a unit appropriate under the circumstances.[12] The determination will not be set aside "unless the Board's discretion has been exercised 'in an arbitrary or capricious manner.' "[13]

■ Notwithstanding the substantial financial autonomy of the clubs, the Board found they form, through the League, an integrated group with common labor problems and a high degree of centralized control over labor relations. In these circumstances the Board's designation of a leaguewide bargaining unit as appropriate is reasonable, not arbitrary or capricious.

In making its decision, the Board expressly incorporated the reasons underlying its finding of a joint employer relationship. The Board emphasized in particular both the individual clubs' decision to form a League for the purpose of jointly controlling many of their activities, and the commissioner's power to disapprove contracts and exercise control over disciplinary matters. Under our "exceedingly narrow" standard of review, no arguments presented by petitioners require denial of enforcement of the bargaining order.[14]

Thus the facts successfully refute any notion that because the teams compete on the field and in hiring, only team units are appropriate for collective bargaining purposes. Once a player is hired, his working conditions are significantly controlled by the League. Collective bargaining at that source of control would be the only way to effectively change by agreement many critical conditions of employment.

---

11. *Compare NLRB v. Checker Cab Co.,* 367 F.2d 692, *with Greater Houston Transportation Co.,* 208 N.L.R.B. 1020 (1974).

12. *NLRB v. Southern Metal Service, Inc.,* 606 F.2d 512, 514 (5th Cir. 1979); *NLRB v. Bogart Sportswear Mfg. Co.,* 485 F.2d 1203, 1206 (5th Cir. 1973).

13. *NLRB v. Southern Metal Service, Inc.,* 606 F.2d at .514, *quoting Spartans Industries, Inc. v. NLRB,* 406 F.2d 1002, 1005 (5th Cir. 1969).

14. *NLRB v. Fidelity Maintenance & Construction Co.,* 424 F.2d 707, 709 (5th Cir. 1970).

**1384**

## DUE PROCESS

The League argues that its clubs were denied due process by the Board's refusal to conduct representation hearings in any city other than New York. Determination of a hearing location is within the Board's discretion.[15] In view of the presence of the League offices and records in New York, and the testimony at the hearings by representatives of four far-flung clubs, the Board did not abuse its discretion by conducting hearings only in New York.

The League next contends that changes in the ownership and location of some of its clubs between the representation hearings in September 1977 and the unfair labor practice adjudication in April 1979 denied due process to the new clubs. Even where new ownership rather than mere changes in location is involved, there is no allegation that any new owner, in voluntarily acquiring an NASL club, did so without notice of either the pendency of representation proceedings or the Board's finding of a joint employer relationship. The position of the new owners is analogous to that of successor corporations which incur the bargaining obligations of their predecessors.[16] To require new representation hearings each time a new joint employer entered the League would endlessly frustrate exercise of the employees' collective bargaining rights.

The clubs were not denied due process in the service of the unfair labor practice complaint. Although one club was not individually served, no allegation is made that any club lacked actual notice, and all were represented by counsel at the proceedings.[17]

Petitioners argue that due process was denied when the Board declined to reopen the case for evidence that the Association was improperly competing with the League by conducting soccer camps and several indoor winter games. The Board properly distinguished *Bausch & Lomb Optical Co.*, 108 N.L.R.B. 1555 (1954), because the conduct of soccer camps is merely incidental to the primary purposes of both the League and the Association. The Board subsequently found the evidence of the indoor games only cumulative of earlier evidence and refused to reopen the case during adjudication of the unfair labor practice complaint. The grant or denial of a motion to reopen the record is within the Board's discretion, which was not abused in this case.[18]

PETITION FOR REVIEW DENIED, ORDER ENFORCED.

15. *NLRB v. Southwestern Greyhound Lines, Inc.*, 126 F.2d 883, 887–88 (8th Cir. 1942).

16. *See NLRB v. Fabsteel Co. of Louisiana*, 587 F.2d 689 (5th Cir.), *cert. denied*, 442 U.S. 943 99 S.Ct. 2887, 61 L.Ed.2d 313 (1979).

17. *See NLRB v. McGahey*, 233 F.2d 406, 408–09 (5th Cir. 1956); *NLRB v. Southwestern Colorado Contractors Association*, 379 F.2d 360, 365 (10th Cir. 1967).

18. *See NLRB v. Miami Coca-Cola Bottling Co.*, 403 F.2d 994, 997–98 (5th Cir. 1968); *NLRB v. Don Burgess Construction Corp.*, 596 F.2d 378, 389 (9th Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979).