**TEXAS WORLD SERVICE CO., INC., d/b/a World Service Company, Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Song Ae LIM d/b/a Lucky Service Co., Respondent.**

Nos. 89–4892, 90–4047.

United States Court of Appeals, Fifth Circuit.

April 18, 1991.

▮▮▮▮▮▮▮▮▮▮▮▮

James S. Horwitz, Houston, Tex., for Texas World Service Co., Inc.

Patrick W. Jordan, Keck, Mahin Cate, San Francisco, Cal., for Song Ae Lim.

Robert F. Mace, Linda J. Dreeben, and Aileen Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for N.L.R.B.

Robert H. Miller, Regional Director, N.L.R.B., San Francisco, Cal., for other interested parties.

Before GARWOOD and WIENER, Circuit Judges, and VELA\*, District Judge.

WIENER, Circuit Judge:

In this consolidated appeal of two complex, fact-intensive labor law cases, this court must consider, *inter alia*, the reversal by the National Labor Relations Board (Board or NLRB) of the finding by the Administrative Law Judge (ALJ) in his lengthy, detailed and well-reasoned Decision that no joint employer relationship existed between a contractor and a subcontractor. Finding that the Board had substantial evidence to support its position, we affirm its findings and grant enforcement of the Board's order.

I

FACTS AND FINDINGS

Texas World Service Company, Inc. d/b/a World Service Company (World), a janitorial contractor whose principal place of business is Houston, Texas, conducts business nationwide, often subcontracting work to other firms which use their own employees. Shik Sony is World's president and owner. Gregory Choo, during the time relevant to this dispute, represented himself to the public as World's vice-president. Clyde Mayhew was responsible for World's day-to-day operations.

In early 1982, World contracted to perform janitorial work for several airlines at San Francisco International Airport (SFO). World subcontracted the SFO work to Whitewood Oriental Maintenance Company (Whitewood), which Charles Yoon owned and operated. Over a year later, on October 3, 1983,[1] World notified Whitewood in writing that it was cancelling the SFO contract effective November 15th. On November 17th, World replaced Whitewood with Lucky Service Company (Lucky), which Song Ae Lim owns and operates.

---

\* District Judge of the Southern District of Texas, sitting by designation.

1. All dates hereafter are 1983 unless otherwise indicated.

Lim had formed Lucky in March. Choo had guaranteed a loan which Lim acquired in order to establish her business. In that same month Lim, on behalf of Lucky, approached Local 77 about entering into a collective bargaining agreement to cover janitorial employees whom Lucky might hire within Local 77's geographical jurisdiction. Lucky and Local 77 entered into such an agreement on April 28th. In July or August, Lucky and Local 77 signed a successor agreement retroactively effective from May 1st of that year until May 1, 1986. Lim entered into these agreements anticipating that she would eventually secure a subcontract from World to perform janitorial work at SFO.

Only when Lucky replaced Whitewood on November 17th did Lucky for the first time hire employees and begin janitorial operations. On that day Lim offered employment to all of Whitewood's janitors willing to work under Lucky's "Rules and Regulations of Personal Conduct." Only two declined employment. On November 21st, Lim and Local 77 signed a revised version of the agreement. The only changes were the effective date, changed to December 1st, and the exclusion of members of Lim's family from insurance coverage. On November 28th, Lim changed the hours of the night-shift workers. On December 1st, she instituted the terms and conditions of the agreement with Local 77.

Earlier, in July of 1983, a Whitewood janitor had begun an organizational campaign in support of Local 77. Although he presented signed authorization cards to Local 77, that local never filed a representation petition with the Board. The same janitor next collected signed authorization cards for Local 87 which on September 22nd filed a representation petition.

Whitewood's owner Yoon notified Sony that Local 87 had filed a petition. Sony directed Choo and Lim to handle the representation election and instructed Yoon to follow their directions. Sony also hired labor relations consultant Kenneth White, directing him to coordinate election strategy with Choo and Lim. Sony directed Yoon to follow White's directions too.

On November 10th the Board conducted an election in a unit of Whitewood's janitors. Nine votes were cast for the union and seven votes were cast against it. Four other ballots were challenged. After a hearing on the challenged ballots and on Whitewood's objections, Local 87 was certified in March 1984 as the exclusive bargaining representative of the janitors.

After Lucky replaced Whitewood in November, Local 87 contacted Choo requesting that Lucky bargain with it. Choo refused. After Local 87 was certified on March 29, 1984, it unavailingly repeated the request in both that and the following month.

In April, 1985, the ALJ held a ten-day hearing on the consolidated complaint which the Board had issued against the companies after Local 87 and several janitors had filed charges against them. In November, 1985, the ALJ issued his decision, ninety pages of which he devoted to his findings. Over three years later, in 1989, the Board issued its Decision and Order, 292 NLRB No. 130 (1989), in which it disagreed with some of the ALJ's findings.

The Board found that (1) World and Lucky as joint employers had violated sections 8(a)(5) and (1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(5) and (1), by refusing to recognize and bargain with Service Employees International Union, Local 87; by recognizing, entering into, and maintaining a collective bargaining agreement with another local of the same international, Local 77; and by unilaterally changing the employees' terms and conditions of employment; (2) World and Lucky had violated sections 8(a)(2) and (1) of the Act, 29 U.S.C. § 158(a)(2) and (1), by recognizing and executing a collective bargaining agreement with Local 77 when it did not represent a majority of the bargaining unit employees; (3) World had violated sections 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1), by replacing Whitewood as subcontractor with Lucky in an attempt to deprive unit employees of their right to representation by their selected representative, Local 87; (4) World had violated Sec-

tion 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by coercively interrogating employees concerning their union sympathies; and (5) World and Lucky had violated section 8(a)(1) by promising employees better terms and conditions of employment if they did not support Local 87 and by threatening that those employees would lose their jobs if they did support it.

In case number 89–4892, World petitioned the court for review of the Board's Decision and Order, which found that World had engaged in unfair labor practices. The Board cross-applied for enforcement of its order. In case number 90–4047, the Board petitioned for enforcement of a portion of the same order against Lucky.

This appeal concerns only some of the disagreements between the Board and the ALJ. The issues here are (1) the Board's finding that Lucky was a joint employer with World and not, as the ALJ found, a successor employer to it; (2) the Board's finding that World discriminatorily changed subcontractors to avoid recognizing and bargaining with Local 87, thereby violating sections 8(a)(3) and (1); and (3) the Board's rejection of the companies' position that prosecution of the section 8(a)(2) charge—bargaining with Local 77 when it did not represent a majority of the janitors—is barred, because it is not closely related to a timely filed section 8(a)(5) charge and because the unfair labor practice upon which the charge was based did not occur during the six months before filing and service of the charge—as section 10(b), 29 U.S.C. § 160(b), requires.

World and Lucky resist enforcement of the Board's order, arguing that when the record is considered as a whole, it does not contain substantial evidence to support the order.

## II

## STANDARD OF REVIEW

■ In reviewing the Board's decisions, this court determines, on the basis of the record taken as a whole, whether *substantial evidence* supports the Board's findings.[2] *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Long present by virtue of legislative mandate in many administrative statutes, the substantial evidence standard sounds simple enough. But for appellate courts charged with reviewing the decisions of administrative tribunals, applying that standard has proved to be a veritable will-o'-the-wisp. The Supreme Court has stated that substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 477, 71 S.Ct. at 459 (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Substantial evidence "must be enough to justify, if the trial went to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Id.* (quoting *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)). The deference accorded the Board's findings of fact is, thus, considerable. *See* 2 S. Childress & M. Davis, *Standards of Review,* § 15.1 (1986); R. Pierce, S. Shapiro, & P. Verkuil, *Administrative Law and Process,* § 7.3.1 (1985).[3]

■ Nevertheless, when, as in the instant case, the Board disagrees with the ALJ's findings, this court examines the evidence and findings of the Board more critically than it would have done had the Board agreed with the ALJ. *Syncro Corp. v. NLRB,* 597 F.2d 922, 925 (5th Cir.1979).

---

**2.** "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e).

**3.** On the spectrum of deference due an agency finding, the District of Columbia Circuit has situated the substantial evidence standard and the arbitrary and capricious standard in the same position. *Association of Data Processing Serv. Orgs., Inc. v. Board of Governors of the Fed. Reserve Sys.,* 745 F.2d 677, 681–686 (D.C. Cir.1984) (discussing "scope of review" provisions of the Administrative Procedure Act, 5 U.S.C. § 706(2)).

We consider "whatever in the record fairly detracts from [the] weight" of the substantial evidence. *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464. But this court still sustains the Board's findings if the record taken as a whole contains substantial evidence to support those findings. *NLRB v. Ridgeway Trucking Co.*, 622 F.2d 1222, 1224 (5th Cir.1980) (citing *Syncro*, 597 F.2d at 925). "The 'substantial evidence' standard is not modified in any way when the Board and the [ALJ] disagree." *Universal Camera*, 340 U.S. at 496, 71 S.Ct. at 469. In requiring courts of appeal to accord the ALJ's contrary findings such relevance as they reasonably command, the Supreme Court explained that it intended

> only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced [ALJ] who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the [ALJ] are to be considered along with the consistency and inherent probability of testimony.

*Universal Camera*, 340 U.S. at 496, 71 S.Ct. at 469.

▪ The significance of the ALJ's findings also depends largely upon the importance of credibility in the particular case. *Id.* In the instant case the Board does not disagree with the ALJ's credibility findings. It disagrees instead with the inferences and conclusions to be drawn from those facts upon which both the Board and the ALJ agree. Provided substantial evidence exists, this court cannot reverse the Board's decision when the Board and the ALJ merely draw different inferences from established facts. *Ridgeway Trucking*, 622 F.2d at 1222 (citation omitted). Moreover, even if this court might reach a contrary result were it deciding the case *de*

*novo*, we defer to plausible inferences that the Board draws from the evidence. *NLRB v. International Ass'n of Bridge, Structural and Ornamental Iron Workers*, 864 F.2d 1225, 1230 (5th Cir.1989) (citing *TRW, Inc. v. NLRB*, 654 F.2d 307, 310 (5th Cir. Unit A Aug. 1981)).

Having read the ALJ's comprehensive opinion,[4] we are not convinced that we would have found World, Whitewood, and Lucky to be joint employers had we been charged with determining that issue afresh. Certainly, had the clearly erroneous standard been the appropriate standard of review, the ALJ could not have been reversed. Nevertheless, we acknowledge that substantial evidence exists on the record considered as a whole to support the Board's findings.

### III

### JOINT EMPLOYERS

The Board found that, as a joint employer of Whitewood's janitors, World had to recognize and bargain with Local 87, the janitors' exclusive bargaining representative. World's legal obligation remaining extant when Lucky replaced Whitewood, the Board found that Lucky had also assumed the obligation to recognize and bargain with Local 87. When both World and Lucky refused to bargain with Local 87, the Board concluded that both had violated sections 8(a)(5) and (1). In addition, as Lucky's bargaining obligation arose immediately upon its assumption of Whitewood's operations, the Board also concluded that Lucky had violated sections 8(a)(5) and (1) by unilaterally implementing its "Rules and Regulations of Personal Conduct" on November 17th and by changing the employees' work schedule on November 28th, in both instances without affording Local 87

---

4. Our adjudication of this case would have proceeded more expeditiously and efficiently had the record excerpts included the ALJ's Decision and had the Board supplied the complete record. Although section 2112(b) of Title 28 of the United States Code permits the filing of an abbreviated record by stipulation or order, the record before us does not contain any stipulation or order to that effect.

Given the pivotal role of the ALJ's Decision in the companies' arguments, their omitting that Decision from the record excerpts is inexplicable. The court had to request a copy from the Board after oral argument. Also, the court twice had to request the complete record from the Board. When the Board eventually complied, it still neglected to include several items.

an opportunity to bargain. According to Lucky and World, the Board's finding that they were joint employers is not supported by substantial evidence.

Whether a joint employer relationship exists is "essentially a factual issue." *Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964). The existence of such a relationship "depends on the control which one employer exercises, or potentially exercises, over the labor relations policy of the other." *North Am. Soccer League v. NLRB, (NASL)* 613 F.2d 1379, 1382 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 128 (1980). In *NASL*, the essential aspects of the labor relations policy which this court examined included, but were not limited to, the selection, retention, and termination of players; the terms of individual contracts, dispute resolution, and player discipline; and the assigning to the league of each club's authority over its labor relations policy. *Id.* This court recognized that "minor differences in the underlying facts might justify different findings on the joint employer issue." *Id.* at 1382–83.

The Board, as it noted in the instant case, applies the standard propounded in *NLRB v. Browning-Ferris Indus. Inc.*, 691 F.2d 1117, 1124 (3d Cir.1982): joint employers "share or co-determine those matters governing essential terms and conditions of employment". *Id.* at 1124. The essential terms and conditions which the third circuit examined included the right to hire, fire, supervise, approve drivers, determine work hours and compensation, and devise work rules; and the provision of uniforms and forms for record keeping. In *Clinton's Ditch Coop. Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir.1985), *cert. denied*, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986), the second circuit concluded that in all of tests which the circuit courts have applied to determine joint employer status in the subcontracting context the essential element is immediate control over the employees. Five factors determine immediate control: hiring and firing; discipline; pay, insurance, and records; supervision; and participation in the collective bargaining process. *Id.* at 138–39.

## A. World—Whitewood

■ In finding that World and Whitewood were joint employers co-determining the terms and conditions of employment of Whitewood's janitors, the Board focused (but not exclusively as World and Lucky claim) on the period in which the unfair labor violations had allegedly occurred— from September 22nd, when Local 87 filed its petition to represent Whitewood's janitors, until November 17, when Lucky assumed Whitewood's janitorial duties. For the purpose of determining whether World and Whitewood were joint employers, events occurring after Whitewood's janitors had sought union representation were more likely to reveal the control, if any, that World exercised or potentially exercised, *see NASL*, 613 F.2d at 1382, over Whitewood's janitors than were events antedating the janitors' action. Events during that period were also more likely to reveal the degree of "immediate control," if any, *see Clinton's Ditch*, 778 F.2d at 138, that World exerted over Whitewood's employees.

Among the events that the Board considered particularly relevant when it concluded that World and Whitewood were joint employers were Sony's assigning Choo, Lim, and White to control Whitewood's election representation strategy and Sony's directing Yoon to follow that threesome's instructions. Whether Yoon independently decided to oppose Local 87, as World and Lucky contend, is irrelevant as substantial evidence exists to indicate that World's representatives directed the election strategy and that Yoon followed their directions, as instructed.

The record contains evidence to establish that World appointed Lim its personal representative at SFO, in which role she actively discouraged Whitewood's employees from supporting Local 87's organizational campaign. Both the ALJ and the Board found that Lim talked with Whitewood employees during work hours, promising them better wages, hours, and benefits if they voted against Local 87, and threatening them with the loss of their jobs if they

voted for Local 87. Although consistent with Lim's desire to maintain her collective bargaining agreement with Local 77, her actions are not inconsistent with the Board's finding that Lim was World's agent in the pre-election period. Finally, both the ALJ and the Board found that Lim and Choo (whose business card proclaimed him to be World's executive vice-president) represented themselves to Whitewood's janitors and other third parties as representatives of World.

The Board also found that White, the labor relations consultant, had signed a retainer agreement only with World, and from October through December he was paid exclusively by World. White testified that until September 1, 1984, World paid for his services. He also testified that he did not enter into a retainer agreement with Whitewood until January 1, 1985, and with Lucky until September 1, 1984. Additionally, while he was being retained only by World, White informed the Board's San Francisco office and Local 87, by letter dated January 3, 1984, that he was representing Whitewood "in all phases of industrial relations." The ALJ found that Sony had recommended White to Whitewood, that Whitewood had employed White based upon its own independent evaluation, that White had worked for Whitewood and had received no instructions from World, and that although World had paid White, World had charged Whitewood for the services which White had performed. Not all of these findings are, as World and Lucky imply, inconsistent with the Board's finding that White acted as an agent of World during the September–November, 1983, period when World had retained and paid White and directed Yoon to follow his election strategy.

Further, as we have already explained, when the Board and the ALJ make contrary fact findings, the deference accorded factual findings favors the Board. *See Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464; *Ridgeway Trucking*, 622 F.2d at 1224. Given the standard which controls our review of the Board's findings, we cannot say that substantial evidence does not support its finding that White was World's agent.[5]

The Board also found evidence to show that World influenced Whitewood's hiring and firing decisions. In May, 1983, after Local 77 had filed charges in 1982 with the San Francisco Human Rights Commission (SFHRC) alleging that World was discriminating in hiring at SFO by employing only Koreans, World and the SFHRC concluded an affirmative action agreement. Responding to that agreement, World directed Whitewood to hire more non-Koreans in order to achieve a more racially representative work force. Furthermore, World affected Whitewood's firing decisions during the September–November period. White told Yoon that one of his employees was ineligible to vote and that he should fire him. Having received instructions from Sony to follow White's directions in matters related to the election, Yoon fired that employee.

Underscoring World's increasing control over Whitewood's employment policies during the period when the unfair labor practices occurred, World provided workers' compensation coverage for Whitewood's employees. Finally, the Board noted, Whitewood janitors wore World badges while they worked and, in transacting business with airlines and suppliers, Whitewood used stationery upon which World's name was imprinted. *See Browning–Ferris*, 691 F.2d at 1119–20.

World and Lucky cite several Board decisions which they claim are inconsistent with its finding of a joint employer relation-

---

5. To illustrate the task confronting this reviewing court, we have attempted to detail compendiously the apparent differences in this instance between the Board's and the ALJ's findings. Given the limited scope of our review, the copious detail which characterizes this dispute, and the fact that the Board's Decision and Order, 292 N.L.R.B. No. 130 (1989), to which the ALJ's Decision is attached, has already provided full details and discussed the different findings, we see no need to repeat that information and further lengthen an already prolix opinion. Consequently, for the remainder of this opinion, we will summarize the evidence that is substantial enough to support the Board's findings.

ship in their case. But these decisions are unavailing. This circuit has already indicated that "minor differences in the underlying facts might justify different findings on the joint employer issue." *NASL*, 613 F.2d at 1382–83. Given all the factors described above, we conclude that substantial evidence supports the Board's finding that World and Whitewood were joint employers who shared or co-determined the Whitewood janitors' terms and conditions of employment.

**B. World—Lucky**

■ For many of the reasons which had convinced it that World and Whitewood were joint employers, the Board found that World and Lucky were also joint employers. In addition to those reasons, however, the Board particularly emphasized the role that World's representative Choo played in Lucky's labor relations after Lucky assumed Whitewood's subcontract on November 17th. Choo not only directed Lim to fire an employee who had actively supported Local 87, but he also participated in the collective bargaining process with Lucky. He accompanied Lim to meetings with Local 77 and assisted in the November 21st contract which Lucky signed with Local 77. *See Clinton's Ditch*, 778 F.2d at 139 (participation in the collective bargaining process is a relevant factor in establishing joint employer status). When Local 87 requested that Lucky bargain with it, Choo told it that Lucky was not obliged to do so.

The Board also found that White, while he had a retainer agreement with World but not with Lucky, acted on World's behalf in drafting and directing that Lucky institute work rules for Lucky's employees. According to the ALJ, the record reveals that Sony paid White for the services that the latter performed for Lucky during 1983.

Finally, the Board cited other evidence supporting its contention that World and Lucky were joint employers. Both the ALJ and the Board found that Lucky's employees wore World badges while working and

that World's workers' compensation policy covered Lucky's employees during Lucky's first six weeks of business at the airport. All these factors constitute substantial evidence which supports the Board's findings that World and Lucky were joint employers.

**C. Lucky—Whitewood**

Because substantial evidence exists to support the Board's findings that World and Whitewood and World and Lucky were joint employers, substantial evidence exists to indicate that Whitewood and Lucky were also joint employers. Two employers who are joint employers with a third employer are joint employers with each other.

**D. Conclusion**

Considered as a whole the record contains substantial evidence to support the Board's finding that World and Lucky were joint employers.

## IV

### UNFAIR LABOR PRACTICES

**A. World's Change of Subcontractors**

The Board found that World's change of subcontractors from Whitewood to Lucky had violated sections 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1) and (3).[6] Sections 8(a)(1) and (3) respectively provide that it is an unfair labor practice "to interfere with, restrain, or coerce employees" in the exercise of their rights to form, join, or assist labor organizations, 29 U.S.C. § 158(a)(1); or by discrimination in hiring or tenure or any term or condition of employment "to encourage or discourage membership in any labor organization," 29 U.S.C. § 158(a)(3). An employer violates sections 8(a)(3) and (1) by switching subcontractors in order not to recognize and bargain with a union. *Syufy Enterprises*, 220 N.L.R.B. 738, 740–41 (1975).

■ The standard for proving a section 8(a)(3) violation is set forth in *Wright Line, Inc.*, 251 N.L.R.B. 1083 (1980), *enforced on*

---

**6.** Concluding that World and Whitewood were not joint employers, the ALJ had dismissed the allegations that changing subcontractors violated sections 8(a)(1) and (3).

*other grounds,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982): if the general counsel has made a prima facie showing that anti-union animus was a motivating factor in the employer's decision to switch subcontractors, the burden shifts to the employer to establish that it would have taken the same action even in the absence of the employees' protected activity. *Id.* at 1089; *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 401–403, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667, 673–76 (1983) (*approving Wright Line,* 251 N.L.R.B. at 1089); *NLRB v. Delta Gas, Inc.,* 840 F.2d 309, 311 (5th Cir.1988).

When an employer denies, as does World, that anti-union animus motivated its decision to switch subcontractors, the Board may rely on circumstantial evidence in determining the employer's actual motive. *Delta Gas,* 840 F.2d at 313. Once the Board has inferred an illegal motive for an employment decision, this court "may not lightly displace the Board's factual finding of discriminatory intent." *NLRB v. Brookwood Furniture, Div. of U.S. Industries,* 701 F.2d 452, 464 (5th Cir.1983). A reviewing court must merely determine whether substantial evidence on the record as a whole supports the Board's finding that World's substitution of subcontractors violated sections 8(a)(3) and (1). *Id.*

The record contains sufficient evidence to support a finding of anti-union animus on the part of World. After Local 87's representation petition of September 22nd apprised Sony of the janitors' union activities, Sony sent Choo, Lim, and White to direct, as we have already described, the campaign against the union. The Board also found that the timing of the switch of subcontractors strongly supports an infer-

ence of illegal motive. Sony, the Board found, decided to replace Whitewood only after he had learned of Local 87's petition. He notified Yoon of that decision on October 3rd. He actually replaced Whitewood only after the election in which the employees had chosen Local 87 as their bargaining representative.[7]

The record also contains an undated letter from World vice-president Mayhew to Republic Airlines, a World client, which Republic received at its SFO station on July 24, 1984. The Board found that Mayhew's letter highlighted World's motives. Mayhew advised the client to change the name of the janitorial contractor from World to Lucky in order to circumvent the higher charges that would result from having to pay the higher wage rate that applied to contractors bound to Local 87. This change was necessary, according to Mayhew, because Local 87 had been "awarded the rights to World," and Local 77 the rights to Lucky.

Substantial evidence supports the Board's finding that the record refutes the various reasons that World advanced to justify its changing subcontractors. Although World argues that its clients were dissatisfied with Whitewood's performance, airline officials testified to the contrary. Moreover, when Sony informed Yoon that World no longer needed Whitewood's services at SFO, he wrote that "[t]his is no reflection upon you or your fine company."[8] Lucky's offer of employment to Whitewood's janitors further undermines the claim that Whitewood's janitors had been performing inadequately at SFO. Finally, both the ALJ and the Board summarily rejected World's argument that Whitewood lost its subcontract because of financial problems.

---

7. World contends that the Board's finding that World decided to change subcontractors only after Local 87 had filed its petition reverses the ALJ's finding that "in September, two weeks prior to Local 87's filing of the election petition, World promised Lim that she would become the new contractor" at the airport. The ALJ did not make any such finding. He found only that "in September" Sony promised Lim that in the near future Lucky would replace Whitewood. The Board's and the ALJ's findings are, therefore, not contradictory.

8. This letter to Yoon adds that "as discussed with you some months ago, you know that a commitment was made with another organization as far back as March of this year (1983)." The Board noted that Yoon testified that World had never notified him of its intention to replace Whitewood until he had received this letter.

In summation, World's proffering shifting and apparently false reasons for changing subcontractors weakened its own position and correspondingly strengthened the Board's conclusion that World had changed subcontractors because of its anti-union animus. *See NLRB v. Georgia Rug Mill,* 308 F.2d 89, 91 (5th Cir.1962). For all the above reasons, therefore, we find substantial evidence to support the Board's findings that World was unlawfully motivated in replacing Whitewood with Lucky, that the motive was to evade the obligation to recognize and bargain with Local 87, and that World failed to demonstrate that it would have changed subcontractors even were the protected activity absent. Substantial evidence, therefore, supports the Board's finding that World violated sections 8(a)(1) and (3).

**B. Lucky's Recognition of Local 77**

■ The Board found that Lucky had violated sections 8(a)(2) and (1) by recognizing and entering into a collective bargaining agreement with Local 77 on November 21st when Local 87, not Local 77, represented a majority of Lucky's employees. The Board also found that World, Lucky's joint employer, was also liable for these violations. For an employer to "dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it" is an unfair labor practice under section 8(a)(2), 29 U.S.C. § 158(a)(2). An employer provides unlawful assistance and violates sections 8(a)(2) and (1) by recognizing and entering into a collective bargaining agreement with a labor organization which does not enjoy majority status. *International Ladies' Garment Workers' Union v. NLRB,* 366 U.S. 731, 737–39, 81 S.Ct. 1603, 1607–08, 6 L.Ed.2d 762 (1961); *accord NLRB v. Signal Oil and Gas Co.,* 303 F.2d 785, 786–87 (5th Cir.1962).

■ Lucky contends that the prosecution of the section 8(a)(2) unfair labor practice is barred. First, it claims that the section 8(a)(2) violation added to an amended complaint in September 1984 was not closely related to the section 8(a)(5) charge that the companies had refused to bargain with Local 87, a charge which Local had filed on April 20, 1984.[9] Second, Lucky contends that the section 8(a)(2) violation did not occur, as section 10(b), 29 U.S.C. § 160(b), requires, during the six months before filing and service of the charge.

**1. "Closely Related" Allegations**

Section 10(b) reads in pertinent part:

no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made.... Any such complaint may be amended by the ... Board in its discretion at any time prior to the issuance of an order based thereon....

29 U.S.C. § 160(b). A complaint based upon a timely filed charge may be amended to include allegations not raised in the timely filed charge if the added allegations are "closely related" to the violations named in the charge and occurred within six months of the charge. *NLRB v. International Union of Operating Eng'rs,* 460 F.2d 589, 596 (5th Cir.1972); *see also NLRB v. Houston Distrib. Servs., Inc.,* 573 F.2d 260, 263 (5th Cir.) (Board "has considerable leeway to found a complaint on events other than those specifically set forth in the charge."), *cert. denied,* 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 705 (1978). The law " 'is well settled that the complaint may allege violations of a different section of the Act than that alleged in the charge if they are closely related to the violations named in the

9. Actual service of the section 8(a)(5) charge on Lucky did not occur until May 22, 1984, six months and one day after Lucky and Local 77 had revised their contract. Because, however, World was served with the amended charge containing the section 8(a)(5) violation on April 20, 1984, because World and Lucky are joint employers, and because the charge concerns

matters for which they are jointly responsible, the Board correctly found that the charge was filed and served on Lucky within six months of its committing the unfair labor practice. *See Mar Del Plata Condominium Ass'n,* 282 N.L.R.B. 1012 (1987); *Photo–Sonics, Inc.,* 254 N.L.R.B. 567, 570 n. 2 (1981), *enforced* 678 F.2d 121 (9th Cir.1982).

charge....'" *American Pac. Concrete Pipe Co.*, 262 N.L.R.B. 1223, 1223 & n. 1 (1982) (citations omitted), *enforced mem.*, 709 F.2d 1514 (9th Cir.1983).

That the relationship between the charge and additional allegations in an amended complaint "need be close enough only to negate the possibility that the Board is proceeding on its own initiative rather than pursuant to a charge" is the "law of this Circuit." *NLRB v. Central Power & Light Co.*, 425 F.2d 1318, 1321 n. 3 (5th Cir.1970) (citing *Texas Indus., Inc. v. NLRB*, 336 F.2d 128, 132 (5th Cir.1964)); *Houston Distrib.*, 573 F.2d at 263 (complaint cannot be "so completely outside the original charge that the Board could be said to have initiated a proceeding on its own motion."). In the instant case the section 8(a)(5) and the section 8(a)(2) allegations satisfy the law of the circuit. Because Lucky justifies its refusal to bargain with Local 87 by insisting that it had a legally enforceable agreement with Local 77, the allegations are sufficiently closely related not to raise the possibility that the Board proceeded on its own initiative rather than pursuant to a charge. Further, the acts underlying both allegations are sufficiently part of the same course of conduct to render the section 8(a)(5) and section 8(a)(2) violations closely related.[10] *See Central Power*, 425 F.2d at 1320 ("[S]ufficient relation has generally been found between acts that are part of the same course of conduct, such as a single campaign against a union.").

2. Section 8(a)(2) Violation within Section 10(b) Period

Lucky also contends that its November dealings with Local 77 can be termed an unfair labor practice only if the Board relies on earlier unfair labor practices—Lucky's recognizing and entering into agreements with Local 77, when Local 77 did not enjoy majority status, in April and again in July or August. As a complaint based on those earlier practices is time-barred, Lucky insists that the Board's relying on the events of November resurrects legally defunct unfair labor practices contrary to the purpose of section 10(b). *See Local Lodge No. 1424, Int'l Ass'n of Machinists v. NLRB*, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (*Bryan Mfg.*); *NLRB v. Auto Warehousers, Inc.*, 571 F.2d 860 (5th Cir.1978).

Lucky's contentions are meritless. Before November 17th, when Lucky replaced Whitewood, no party had reason to file charges against Lucky. Before November 17th Lucky had no employees. Therefore, before that date nobody could have—or, in Local 87's case, would have—challenged Lucky's executing an agreement with Local 77. Consequently, the right or the incentive to bring a charge against Lucky for recognizing and entering into a contract with Local 77 did not accrue until November 17th at the earliest. *See Auto Warehousers*, 571 F.2d at 863–64 (time "a charge based on contract enforcement first could have been brought" determines whether charge can be predicated upon instance of enforcement or implementation occurring within the section 10(b) period). Commensurate with the purpose of section 10(b), a charge brought within six months of Lucky's first hiring employees does not, therefore, bring Lucky "to book on stale charges." *See Bryan Mfg.*, 362 U.S. at 424, 80 S.Ct. at 831, 4 L.Ed.2d at 842.

C. Section 8(a)(1) Violations

The Board found that World as a joint employer with Whitewood had violated section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), by coercively interrogating employees concerning their union sympathies. The Board also found that, through Lim, World and Lucky had violated section 8(a)(1) by promising employees that their terms and conditions of employment would

---

**10.** When the Board determined that the amended complaint and the charge filed were closely related, it applied a more rigorous enquiry than the law of this circuit demands. Relying on *Redd–I, Inc.*, 290 N.L.R.B. No. 140 (1988), the Board posed three queries, which it answered affirmatively: whether the allegation and the charge involved the same legal theory; whether the allegations arose out of the same factual situation or sequence of events; and whether the respondent would raise the same or similar defenses to both allegations.

improve if they did not support Local 87, and by threatening employees with the loss of their jobs if Local 87 won the election.

The companies have stated that they "abandon any claims they might have with respect to the Board Order concerning Section 8(a)(1) interrogation and threats." Consequently, we grant the Board's application for enforcement of those portions of its Order based on its now uncontested findings that the interrogation, threats, and promises violated section 8(a)(1).

## V

## CONCLUSION

We find that substantial evidence on the record considered as a whole supports the Board's finding that World and Lucky were joint employers which violated sections 8(a)(5) and (1) of the NLRA by refusing to recognize and bargain with Local 87; by recognizing, entering into, and maintaining an agreement with Local 77; and by unilaterally changing the employees' terms and conditions of employment. Substantial evidence also supports the Board's finding that World and Lucky violated sections 8(a)(2) and (1) of the NLRA by recognizing and executing a collective bargaining agreement with Local 77 when it did not represent a majority of the bargaining unit employees.

Substantial evidence likewise supports the Board's finding that World violated sections 8(a)(3) and (1) by replacing Whitewood as subcontractor with Lucky in order to deprive employees of their right to representation by Local 87.

Because we find that, on the record as a whole, substantial evidence supports the Board's conclusions, ENFORCEMENT IS GRANTED.