## VIRGINIA ELECTRIC & POWER CO. *v.* NATIONAL LABOR RELATIONS BOARD.

No. 709.   Argued May 6, 1943.—Decided June 7, 1943.

*Messrs. George D. Gibson* and *T. Justin Moore* for petitioner.

*Mr. Robert B. Watts,* with whom *Solicitor General Fahy* and *Messrs. Robert L. Stern, Ernest A. Gross,* and *Owsley Vose* and *Miss Ruth Weyand* were on the brief, for respondent.

MR. JUSTICE MURPHY delivered the opinion of the Court.

After the remand of this case in 314 U. S. 469, the Board reconsidered it upon the original record, made new findings of fact, and concluded that the Company had violated

§ 8 (1), (2) and (3) of the Act. 29 U. S. C. § 158. A new order was entered requiring the Company to cease and desist from the unfair labor practices found and from giving effect to its contract with the Independent Organization of Employees. The order also directed the Company to withdraw recognition from and disestablish the I. O. E. as a representative of its employees, to reinstate with back pay two of three employees found to have been discriminatorily discharged, to reimburse its employees in the amount of dues and assessments deducted from their wages by the Company and paid to the I. O. E., and to post appropriate notices. 44 N. L. R. B. 404. The court below, one judge dissenting in part, upheld the order in full. 132 F. 2d 390. The I. O. E. then apparently decided to dissolve, and the Company withdrew recognition from and disestablished it. Because of an apparent conflict of decisions, we granted the Company's petition for certiorari which challenged only the authority of the Board to require reimbursement of the checked-off dues, a point not reached when the case was here before.[1]

The new findings are much more elaborate than those originally before us in 314 U. S. 469, and it would serve no

---

[1] In eleven cases five circuits, under varying circumstances and on diverse reasoning, have refused to enforce Board orders requiring reimbursement of checked-off dues. See *Western Union Telegraph Co.* v. *Labor Board*, 113 F. 2d 992 (C. C. A. 2); *Corning Glass Works* v. *Labor Board*, 118 F. 2d 625 (C. C. A. 2); *Labor Board* v. *West Kentucky Coal Co.*, 116 F. 2d 816 (C. C. A. 6); *Labor Board* v. *U. S. Truck Co.*, 124 F. 2d 887 (C. C. A. 6); *Labor Board* v. *Gerity Whitaker Co.*, 137 F. 2d 198 (C. C. A. 6); *Labor Board* v. *J. Greenebaum Tanning Co.*, 110 F. 2d 984 (C. C. A. 7); *A. E. Staley Mfg. Co.* v. *Labor Board*, 117 F. 2d 868 (C. C. A. 7); *Reliance Mfg. Co.* v. *Labor Board*, 125 F. 2d 311 (C. C. A. 7); *Kansas City Power & Light Co.* v. *Labor Board*, 111 F. 2d 340 (C. C. A. 8); *Labor Board* v. *Southwestern Greyhound Lines*, 126 F. 2d 883 (C. C. A. 8); *Labor Board* v. *Continental Oil Co.*, 121 F. 2d 120 (C. C. A. 10).

useful purpose to discuss them minutely. The following outline is sufficient for an understanding of the issues raised: The findings sketch in considerable detail the anti-union background of the Company and the activities of Bishop, the superintendent of the Company's Norfolk transportation department, including his suggestions to employees Ruett and Elliott that they form unaffiliated organizations. The growth of the I. O. E. is traced from the speeches and meetings of May 24, 1937, which were held after requests for collective bargaining were received by the Company from several small groups of employees as a result of the bulletin of April 26, and which were attended by representatives selected by the employees at the suggestion of the Company. The tracing continues with a discussion of the reactions of those representatives after the Company officials left the meetings and their subsequent reports delivered to the employees on Company property and in some instances on Company time with the help of supervisory employees. Emphasis is placed upon the frequent meetings on Company property held by the resultant Norfolk and Richmond steering committees during the first part of June. The Constitution and by-laws of the I. O. E. were adopted on June 15. The membership campaign began June 17, and within two weeks the I. O. E. had a majority of the Company's 3,000 widely scattered employees. The Board contrasted this with its findings that during the critical formative period of the I. O. E. the Company discharged one Mann, an outspoken foe of an "inside" union, that Edwards, a supervisor, kept C. I. O. meetings under surveillance and warned some employees against "messing with the C. I. O.," and that the Company denied the use of its premises to representatives of national labor organizations, and then drew the conclusion that the quick success of the I. O. E. membership campaign "must be attributed in large part to the respondent's [Company's]

sponsorship of and assistance to the I. O. E. and its persistent and well-known opposition to national unions."

Continuing, the findings relate that the representatives of the I. O. E. in convention on July 17 and 18, drew up a proposed contract, embodying demands for a closed-shop, check-off of I. O. E. dues and substantial wage increases, which was sent to the Company with a request for a bargaining conference. The conference began on July 30, and the Company quickly gave recognition and offered no objection to the check-off provision, with the addition of a proviso that the employees might revoke their authorizations at any time. The by-laws of the I. O. E., however, required all members to authorize the deduction of dues, and the membership applications contained such authorizations. The closed-shop provision was discussed for two hours and then postponed for other matters until the following day, when it was again taken up for two hours and then agreed to with the addition, at the instance of the Company, of a provision that nothing in the contract should prevent employees from joining or remaining members of any other labor organization. Wage increases, costing the Company $600,000 annually, were granted, and, as President Holtzclaw had promised at the May 24 meeting in Richmond, they were made retroactive to June 1. The contract was formally executed August 5, and on August 20 the Company paid $3,784.50 to the I. O. E. as dues under the check-off provision, although it had not yet deducted that entire amount from the wages of its employees. The Board considered "the promptness with which the respondent [Company] agreed to grant the I. O. E. a check-off of dues and a closed shop . . . after a comparatively few hours discussion," and then found that the Company "agreed to the closed shop and the check-off of I. O. E. dues in order to entrench the I. O. E. among the employees and to insure its financial stability."

On the basis of these findings the Board concluded that:

"the respondent has engaged in a course of conduct calculated to restrain and discourage its employees from self-organization in nationally affiliated unions and to divert and canalize their organizational efforts to the establishment of a company-wide unaffiliated labor organization; that in its totality, the respondent's conduct has been coercive of its employees in the exercise of their right to self-organization, with the result that when they formed the I. O. E. they were not as free as the statute requires; that the I. O. E. is the fruit of the respondent's illegal interference with, and restraint and coercion of its employees; and that the respondent has dominated the formation and administration of the I. O. E., and has contributed financial and other support to it."

and again that:

"the I. O. E. was not the result of the employees' free choice; that it was initiated in response to the urgings of the respondent at the May 24 meetings to set up their 'own' organization; that the respondent's support of the organization during the critical formative period and its consistent opposition to nationally affiliated organizations are largely responsible for the adherence of the employees to the organization; and that the contract with the I. O. E. granting a closed shop and the check-off of the I. O. E. dues marked the climax of the respondent's efforts to erect an unaffiliated organization as a bulwark against nationally affiliated organizations. We find that the respondent has dominated and interfered with the formation and administration of the I. O. E. and has contributed support to it, . . ."

In discussing the appropriate remedy for the unfair labor practices found, the Board stated that the Company's domination and interference in the formation and administration of the I. O. E. constituted "a continuing obstacle to the exercise by the employees of the rights guaranteed them by the Act" and therefore the disestablishment of the I. O. E. was necessary. In addition the Board was of opinion that "under the circumstances of

this case" the Company should be ordered to reimburse its employees for the amounts checked-off their wages and paid to the I. O. E.[2]

The Company no longer attacks the conclusion that the I. O. E. was dominated by it, but it does contest the validity of the findings relating to domination in so far as may be pertinent to the reimbursement order, and it challenges the power of the Board to make that order under the circumstances of the case.

Under the applicable principles governing the scope of our review of Board orders, we think the Board's findings and conclusions regarding the Company's domination of and interference with the I. O. E. are supported by sub-

---

[2] The Board's full statement on this point follows:

"The respondent concluded a closed-shop contract with the I. O. E., a company-dominated organization, thus compelling its employees to become and remain members of the illegal organization. Employees were in fact discharged because they refused to join the I. O. E. The check-off provision, a device by which the respondent assured the financial stability of the company-dominated organization, could no more be avoided by the employees than could the compulsory membership requirement. The bylaws of the I. O. E. required its members to execute check-off authorizations under penalty of being dropped from membership in the I. O. E., and thereby, under the closed-shop provision, from their jobs. We find that the monies thus deducted from the wages of the employees constituted the price of retaining their jobs, a price coerced from them for respondent's purpose of supporting and maintaining the organization which respondent had dominated in order to thwart bona fide representation. We further find that, as a result of the imposition of the illegal closed-shop and check-off requirements, the employees suffered a definite loss and deprivation of wages equal to the amounts deducted from their wages and paid over to the I. O. E. It is appropriate that the employees be made whole by reimbursement of amounts exacted from them for illegal purposes. We find that in these circumstances, the effects of the unfair labor practices may be fully remedied and the purposes and policies of the Act may be completely effectuated only by restoring the *status quo*. Hence, we shall order the respondent to reimburse its employees for the amounts deducted from their wages for dues and assessments in the I. O. E."

stantial evidence, and therefore conclusive. See *Labor Board* v. *Link-Belt Co.*, 311 U. S. 584; *I. A. of M.* v. *Labor Board*, 311 U. S. 72; *Labor Board* v. *Automotive Maintenance Machinery Co.*, 315 U. S. 282; *Labor Board* v. *Nevada Copper Co.*, 316 U. S. 105; *Labor Board* v. *Southern Bell Tel. Co.*, *ante*, p. 50. These findings and conclusions are not subject to the infirmities of the original ones which prompted our decision in 314 U. S. 469. While the bulletin of April 26 and the speeches of May 24 are still stressed, they are considered not in isolation but as part of a pattern of events adding up to the conclusion of domination and interference. We are also of opinion that the Board had power to enter the check-off reimbursement order in the circumstances of this case.

Section 10 (c) of the Act [3] authorizes the Board to require persons found engaged or engaging in unfair labor practices "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." The declared policy of the Act in § 1 is to prevent, by encouraging and protecting collective bargaining and full freedom of association for workers, the costly dislocation and interruption of the flow of commerce caused by unnecessary industrial strife and unrest. See *Labor Board* v. *Jones & Laughlin,* 301 U. S. 1. Within this limit the Board has wide discretion in ordering affirmative action; its power is not limited to the illustrative example of one type of permissible affirmative order, namely, reinstatement with or without back pay. *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 187–89. The particular means by which the effects of unfair labor practices are to be expunged are matters "for the Board not the courts to determine." *I. A. of M.* v. *Labor Board, supra,* at p. 82; *Labor Board* v. *Link-Belt Co.,*

---

[3] 49 Stat. 449; 29 U. S. C. § 151 *et seq.*

*supra,* at p. 600. Here the Board, in the exercise of its informed discretion, has expressly determined that reimbursement in full of the checked-off dues is necessary to effectuate the policies of the Act. We give considerable weight to that administrative determination. It should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act. There is no such showing here.

The Board found that the Company was responsible for the creation of the I. O. E. by providing its initial impetus and direction and by contributing support during its critical formative period. It further found that the Company quickly agreed to give its creature closed-shop and check-off privileges "in order to entrench the I. O. E. among the employees and to insure its financial stability." The result was that the employees, under the I. O. E. by-laws, had to authorize wage deductions for dues to remain members of the I. O. E., and they had to remain members to retain their jobs.[4] Thus, as a price of employment they were required by the Company to support an illegal organization which foreclosed their rights to freedom of organization and collective bargaining. To hold that the Board is without power here to order reimbursement of the amounts so exacted is to hold that an employer is free to fasten firmly upon his employees the cost of maintaining an organization by which he effectively defeats the free exercise of their rights to self-organization and collective bargaining. That this may pervert the purpose of the Act is clear. It is equally clear that the undoing of the effects of such a practice may, in the judgment of the Board, remove a very real barrier to the effec-

---

[4] The proviso in the check-off agreement that employees might revoke their individual authorizations at any time was admittedly meaningless in view of the closed shop agreement and the requirement in the I. O. E. by-laws that its members authorize the check-off.

tuation of the policies of the Act, the protection of commerce through the elimination of industrial conflict by guaranteeing full freedom of association and genuine collective bargaining to employees. An order such as this, which deprives an employer of advantages accruing from a particular method of subverting the Act, is a permissible method of effectuating the statutory policy.

It is argued that disestablishment of the I. O. E. sufficiently effectuates the policies of the Act by restoring to the employees of the Company their freedom of association. But the Board need not be satisfied with the remedy alone. It has here determined that, to effectuate fully the policies of the Act, it is necessary to expunge the effects of the unfair labor practices by ordering the reimbursement of checked-off dues. Such a determination seems manifestly reasonable. It returns to the employees what has been taken from them to support an organization not of their free choice and places the burden upon the Company whose unfair labor practices brought about the situation. The deduction of dues from wages under the circumstances of this case is not unlike a loss occasioned by a discriminatory discharge, and an order for the return of those checked-off dues promotes the policies of the Act in substantially the same manner as would a back pay award. By returning their money to the employees, the order severs possible economic ties which they may have with the employer-dominated I. O. E. and to this extent aids in completely disestablishing that organization and restoring to the employees that truly unfettered freedom of choice which the Act demands. If employees have some assurance that an employer may not with impunity impose upon them the cost of maintaining an organization which he has dominated, any more than he can make them bear the burden of a discriminatory discharge, they may be more confident in the exercise of their statutory rights.

The Company contends that the Board did not find that it continued to interfere with the I. O. E. after its organization, except with regard to the closed-shop and check-off clauses of the contract, and this finding is attacked as without foundation in evidence. It is said that the demand for a closed-shop and check-off originated with the employees who were free to abandon those provisions at any time by changing their by-laws or the contract, and that therefore the continuation of those requirements was the voluntary action of the employees for which the Company is not responsible. Finally it is urged that the Company should not be compelled to reimburse these voluntary payments because the employees received benefits, including substantial wage increases, from the I. O. E.

The short answer is that the Board has resolved all these contentions against the Company, and we cannot say it exceeded its competence in so doing. It made no finding of specific management interference in the I. O. E. after the execution of the contract, but it did conclude that the I. O. E.'s existence was a "continuing obstacle" to the employees' exercise of their statutory rights. This conclusion of continuation of the effects of an employer-dominated beginning is a permissible one for the Board to draw. Cf. *Labor Board* v. *Southern Bell Tel. Co., ante,* p. 50. It disposes of the argument that the men were free at any time to eliminate the check-off; because of the I. O. E.'s origin the Board could conclude, as it did, that they were not as free as the statute requires. Also, in view of the Company's interference in and support given to the I. O. E. and the celerity of agreement in the bargaining conference, the Board could infer, despite the fact that demands for the closed-shop and the check-off originated with the I. O. E., that the Company seized upon those provisions to establish the I. O. E. firmly. The fact that a contrary inference is possible from the evidence does not allow us to set aside the one

drawn by the Board. *Labor Board* v. *Nevada Copper Co.*, 316 U. S. 105. This dissipates the force of the argument that the closed-shop and check-off provisions were forced upon the Company against its will.

The instant reimbursement order is not a redress for a private wrong. Like a back pay order, it does restore to the employees in some measure what was taken from them because of the Company's unfair labor practices. In this, both these types of monetary awards somewhat resemble compensation for private injury, but it must be constantly remembered that both are remedies created by statute—the one explicitly and the other implicitly in the concept of effectuation of the policies of the Act—which are designed to aid in achieving the elimination of industrial conflict. They vindicate public, not private, rights. Cf. *Agwilines, Inc.* v. *Labor Board*, 87 F. 2d 146, 150–51; *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177. For this reason it is erroneous to characterize this reimbursement order as penal or as the adjudication of a mass tort. It is equally wrong to fetter the Board's discretion by compelling it to observe conventional common law or chancery principles in fashioning such an order, or to force it to inquire into the amount of damages actually sustained. Whether and to what extent such matters should be considered is a complex problem for the Board to decide in the light of its administrative experience and knowledge. The Board has here determined that the employees suffered a definite loss in the amount of the dues deducted from their wages and that the effectuation of the policies of the Act requires reimbursement of those dues in full. We cannot say this considered judgment does not effectuate the statutory purpose.

The argument that the employees received some value from their contributions via the check-off to the company-dominated I. O. E., is based upon the assumption that

such an organization necessarily gives some *quid pro quo*. But in view of the purposes of the Act, a contrary assumption, that employees receive no benefit from a type of organization which Congress has characterized as detrimental to the interests of employees and provocative of industrial unrest, is possible. These are considerations for the Board to decide according to its reasoned judgment. We hold that the Board here made an allowable judgment. That judgment cannot be upset by pointing to substantial wage increases which the I. O. E. was granted. As the court below said, "it is manifestly impossible to say that greater benefits might not have been secured if the freedom of choice of a bargaining agent had not been interfered with." 132 F. 2d at 398. Cf. *Texas & New Orleans R. Co.* v. *Railway Clerks,* 281 U. S. 548, 559.

This reimbursement order cannot be labelled "penal." The purpose of the order is not to penalize the Company by requiring repayment of sums it did not retain in its treasury. Those sums did go into the treasury of the Company's creature to accomplish purposes the Company evidently believed to be to its advantage, and the order of reimbursement is intended to remove the effects of this unfair labor practice by restoring to the employees what would not have been taken from them if the Company had not contravened the Act. This is not a case in which the Board has ordered the payment of sums to third parties, or has made employees more than whole. Cf: *Republic Steel Corp.* v. *Labor Board,* 311 U. S. 7. The fact that the Board may only have approximated its efforts to make the employees whole, because of asserted benefits of dubious and unascertainable nature flowing from the I. O. E., does not convert this reimbursement order into the imposition of a penalty. Cf. *Overnight Motor Co.* v. *Missel,* 316 U. S. 572, 583–84.

We need not now examine the various situations that were before the Circuit Courts of Appeals in the cases collected in Note 1, *ante*, or consider hypothetical possibilities. We decide only the case before us and sustain the power of the Board to order reimbursement in full under the circumstances here disclosed.

*Affirmed.*

MR. JUSTICE FRANKFURTER, concurring:

If the controlling facts in this case were like those in *Western Union Tel. Co.* v. *Labor Board,* 113 F. 2d 992, I too would accept the reasoning of Judge Learned Hand's opinion in that case and join my brother ROBERTS. But the vital difference between the *Western Union* and this case is that, in the former, "there was no evidence that all those [employees] who asked to have their wages stopped, did so in any part because they were coerced." *Id.,* at 997. Here the employees had no such choice; they could avoid the check-off of union dues only by giving up their jobs.

We start with the Board's finding—a finding not here for review—that through its domination of the I. O. E. the Company indulged in an unfair labor practice. But not only did it foster that company union, it foisted membership in the union upon all its employees. The Board had a right to find that membership in the union, which the employees had no power to reject, equally denied the employees the power to reject the costs of that membership. It was therefore justified in concluding that the employees should be made whole for that which was the consequence of the Company's compulsion upon them. Therein this case differs not only from the *Western Union* case but also from the decisions in four other circuits upon which my brother ROBERTS relies: *Labor Board* v. *West Kentucky Coal Co.,* 116 F. 2d 816, 823 (C. C. A. 6); *Reliance Mfg. Co.* v. *Labor Board,* 125 F. 2d 311 (C. C. A. 7);

*Labor Board* v. *Southwestern Greyhound Lines,* 126 F. 2d 883, 887 (C. C. A. 8); *Labor Board* v. *Continental Oil Co.,* 121 F. 2d 120, 125 (C. C. A. 10).

Needless to say, we have nothing to do with the wisdom of the Board's requirement that the coerced dues be restored to the employees. Our decision can go no further than that, within the framework of the general authority given to it by Congress, the Board is empowered to find that when men pay dues to a company-dominated union, upon pain of forfeiting their jobs, it is the company which has in fact commanded the payment of the dues and it is the company which must make restoration.

Mr. Justice Roberts:

The single question presented is whether the National Labor Relations Board, in ordering disestablishment of an unaffiliated union, may, in the circumstances disclosed, order reimbursement of dues paid by the employes to the union pursuant to individual assignments by employes and a union agreement for a closed shop and a check-off of dues.

The court below (one judge dissenting) has sustained this feature of the order. I am of opinion that its judgment should be reversed.

The only provision of the Act on which the Board relies is that found in § 10 (c)[1] which is that the Board may require the employer "to cease and desist from such unfair labor practice, and to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." The critical phrase is "to take such affirmative action . . . as will effectuate the policies of this Act." The policies of the Act are stated in § 1 [2] as the encouragement of the

---

[1] 29 U. S. C. § 160 (c).
[2] 29 U. S. C. § 151.

practice and procedure of collective bargaining and the protection of the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.[3] It is plain that a reimbursement order may be made by the Board only if it will effectuate these policies.

The court below has interpreted this grant of power to the Board as permitting what the court characterizes as a restoration of the *status quo*. The Act, however, contains no such expression and if it is given, as I think it has been in the present instance, the meaning of redress of private wrongs, it misrepresents the clear intent of the statute.[4]

The Act gives the Board no power to impose liability for any supposed injury arising out of the compulsion of employes to contribute dues to the union. Nor can the order of restitution be grounded upon any theory that, although the unfair labor practice constitutes a public rather than a private wrong, the power granted to effectuate the policies of the Act envisages imposition of a penalty for wrongful conduct on the part of the employer.[5]

There remains the question whether the order under review can be justified as appropriate to effectuate the policies of the Act. This question should be answered in the light of the facts disclosed by the record. The Board has found that the employer was guilty of unfair labor practices in influencing employes in favor of a company

---

[3] See *Republic Steel Corp.* v. *Labor Board,* 311 U. S. 7, 10; *Labor Board* v. *Fansteel Corp.,* 306 U. S. 240, 257.

[4] H. R. 972, 74th Cong., 1st Sess., p. 21; H. R. 1147, 74th Cong., 1st Sess., p. 24. *National Licorice Co.* v. *Labor Board,* 309 U. S. 350, 362, 363.

[5] *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197, 236; *Republic Steel Corp.* v. *Labor Board,* 311 U. S. 7, 11, 12.

union. The order requires the company to cease and desist from the practices, to cease giving effect to the existing agreement with the union, and to withdraw recognition from and disestablish that organization as a bargaining unit. This order is supported by findings that, at a time when no union existed, the company threw its influence in favor of an unaffiliated or company union. All the facts found in this connection relate to a time anterior to the organization of the union. There is no finding, and no facts which would justify a finding, that subsequent to the organization of the union the employer interfered with it, dominated it, or supported it in any manner. The union then organized made demands upon the company which were the subject of negotiations and out of those negotiations grew an increase of wages totaling about $600,000 per annum and a collective bargaining agreement which contained provisions for a closed shop and for the check-off of union dues, both of which features were demanded and insisted upon by the union. There is no finding and no evidence that the employer in fact inspired, instigated, or coerced the employes to make these demands or had, even remotely, anything to do with them other than they followed its earlier encouragement of the organization of the union. From the day that contract was signed, no act of interference or domination, and no word even of suggestion from the company as to the union policy or practices is shown. The record demonstrates that the employer insisted that the check-off of union dues should be authorized by each employe individually, subject to his untrammeled right of revocation, and that the closed-shop provision should not prevent any member of the company union from also joining any other union of his choice. The fixation of the union dues was a matter within the control of the union members and continuance of check-off as respects any employe was a matter for his voluntary determination so far as the

employer was concerned. While it is not denied that the union procured substantial benefits for its members or that it represented them faithfully and fairly, nevertheless, because of the company's interference at the time of the organization of the union, that organization has been disestablished and indeed has now been dissolved.

It is to be noted that had it not been for the defect which tainted its capacity to represent the employes, its other activities would have been wholly in accordance with the objects and purposes of the National Labor Relations Act. Nothing in that Act invalidates a collective bargaining agreement providing for a closed shop or for a check-off of dues. If in fact those features of the agreement were the voluntary act of the employes, as on this record they must be found to have been, it is difficult to see how the policies of the Act are to be effectuated by repayment to the employes of the dues heretofore paid when such repayment can in no wise benefit the association which has been disestablished.

The company union having been disestablished, the employes are free to form or join any union and make it their bargaining agent. Any possible effect of company influence has been dissipated. The only possible effect of restitution of dues to employes who have not asked for repayment, who have received substantial benefits from their contribution of dues, is to punish the employer and perchance operate as a warning to other employers that they will similarly be punished for unfair labor practices.

The Board seeks to sustain the order on the ground that the Act authorizes, as one form of affirmative action to effectuate the policies of the Act, the reinstatement of employes with or without back pay. The award of back pay, however, stands on a different basis. If employes are to be faced with discriminatory discharge for advocating union representation by an organization of their choice, the threat will render doubtful, if not impossible, free and

uncontrolled action on the part of the employes. The Act, therefore, is an announcement to employes that if they are discharged for such activity they may have reinstatement and, in proper cases, back pay. Such a promise to employes was essential to assure them immunity for conduct made lawful by the Act. But the payment of union dues is quite another matter, particularly where, as here, no employe was obliged to join the union, and no discrimination between employes resulted from joining or paying dues to the recognized union. It is inconceivable that the hope of reimbursement of dues paid to the union in question would have any effect on the conduct of the members to join or refrain from joining this union or joining another as they were free to do. Moreover, the employes were free under the Act to adhere to another organization and to bring about an election for the choice of another bargaining representative. The Board made no inquiry and no finding respecting coercion of individual employes.

As I have already indicated, the only effect of the order is to redress a supposed private wrong to employes which the evidence and findings indicate never was inflicted, and to inflict drastic punishment of the employer for its earlier violation of the statute by encouraging its employes to organize. Neither is within the competence of the Board, as this court has repeatedly held.[6]

Like orders have been before the courts in eleven other cases, as shown by the opinion of the Court. All have reached the conclusion that the Act does not authorize such an order.[7] I think that should be the decision of the Court in this case.

The CHIEF JUSTICE and MR. JUSTICE JACKSON join in this dissent.

---

[6] See Notes 4 and 5, *supra*.

[7] I might well have contented myself, in lieu of writing, with a reference to the opinion in *Western Union Tel. Co.* v. *Labor Board,* 113 F. 2d 992, which exhaustively and convincingly deals with the subject.