United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 10, 1999 Decided October 22, 1999 

 No. 98-1433

 Peter O'Dovero d/b/a Associated Constructors, 
 and O'Dovero Construction, Inc., 
 Petitioners

 v.

 National Labor Relations Board, 
 Respondent

 On Petition for Review and Cross-Application 
 for Enforcement of an Order of the 
 National Labor Relations Board

 Charles W. Gorham argued the cause and was on the briefs 
for petitioner.

 Richard A. Cohen, Attorney, National Labor Relations 
Board, argued the cause for respondent. With him on the 
brief were Linda Sher, Associate General Counsel, and John 

D. Burgoyne, Acting Deputy Associate General Counsel. 
David S. Habenstreit, Attorney, entered an appearance.

 Before: Sentelle, Randolph and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: Petitioner Peter O'Dovero d/b/a 
Associated Constructors and O'Dovero Construction, Inc. ap-
peals the decision and order of the National Labor Relations 
Board finding that it violated s 8(a)(1), (a)(3) and (a)(5) of the 
National Labor Relations Act ("Act"), 29 U.S.C. ss 158 (a)(1), 
(a)(3), and (a)(5), and directing that petitioner henceforth 
cease and desist from "[d]iverting work from one group of 
employees to another in order to discourage union activity," 
and "[r]esume bidding for jobs to be performed by unit 
employees under bidding practices as they existed prior to 
the unlawful diversion of union work." Peter O'Dovero d/b/a 
Associated Constructors and O'Dovero Construction, Inc., 
325 N.L.R.B. No. 187, 1998 WL 380989, at *5 (1998). Before 
the court, petitioner makes four claims of error: first, that 
the Board was precluded from making a single employer 
finding in light of a prior prosecutorial decision not to pursue 
such a union complaint and the union was estopped from 
bringing the instant case; second, the Board's finding that 
O'Dovero has not ceased its operations is unsupported by 
substantial evidence in view of the evidence that it was 
performing no work nor bidding on contracts and that discus-
sions about dissolving O'Dovero began two years earlier; 
third, that the Board's finding that work was diverted from 
O'Dovero to Associated elevates treatment of a union subcon-
tractor and distorts the underlying contractual relationship; 
and fourth, that the Board abused its discretion by imposing 
an unduly burdensome remedy, effectively forcing resumption 
of unprofitable operations. Only the latter contention re-
quires some explication. Because the Board's findings are 
supported by substantial evidence in the record, and because 
the Board did not abuse its discretion in requiring resumption 
of the status quo pro ante, we deny the petition and order 

enforcement of the Board's order.1

 I.

 Associated Constructors ("Associated") and O'Dovero Con-
struction, Inc. ("O'Dovero") are family owned and run con-
struction companies. Associated, founded in the 1980s, is 
owned entirely by Peter O'Dovero, while O'Dovero, estab-
lished in the 1960s, is owned by Peter O'Dovero, his wife Lois, 
and his son James, who is president of O'Dovero. Historical-
ly, O'Dovero has performed work on Associated's projects, 
specializing in laying underground pipe. That work is per-
formed by unionized employees, who are hired on an as 
needed basis during the construction season, which generally 
runs from mid-April to the end of November. O'Dovero has 
recognized the International Union of Operating Engineers, 
Local 324 ("the Union") since its incorporation, although the 
Union was not certified until 1993. Associated has never 
recognized the Union, although the Union has made attempts 
to organize its employees.

 The instant case arises in connection with a project begun 
in April 1995 to replace underground water pipes in Caspian, 
Michigan. The heavy equipment work involved in laying 
underground pipe was assigned to O'Dovero. On several 
occasions before the job shut down in November, Craig 
Dufresne, job superintendent of the O'Dovero equipment 
operators, as well as supervisor of approximately ten Associ-
ated laborers, told the heavy equipment operators that the 
job was non-union, although the operators were then being 
paid union wages and receiving union benefits, and were paid 
as well for show-up as required under the collective bargain-

__________
 1 Petitioner does not challenge the Board's findings that peti-
tioner violated s 8(a)(1) and (a)(5) by failing to bargain with the 
Union for a new contract and with respect to the diversion of work 
on the Caspian project, by making coercive statements regarding 
employees' decisions to join or to stay in the Union, and by dealing 
directly with Union represented employees. Accordingly, we affirm 
those findings. See, e.g., Corson and Gruman Co. v. NLRB, 899 
F.2d 47, 50 n.4 (D.C. Cir. 1990).

ing agreement between the Union and O'Dovero. Because 
considerable pipe laying work remained to be done, Dufresne 
told the operators that the project would start up again when 
the weather broke.

 In April 1996, shortly before O'Dovero's contract with the 
Union was to expire, Bill Gray, the Union's bargaining repre-
sentative, asked James O'Dovero about bargaining the terms 
of a successor contract. Gray was informed that a new 
contract might not be possible because Peter O'Dovero was 
upset that the Union had tried to organize Associated's 
employees. On June 20, 1996, Gray was told that O'Dovero 
had decided to cease operations. Similar statements were 
made regarding Peter O'Dovero's anger at the Union by 
Dufresne, when he tried in the spring of 1996 to recruit 
O'Dovero employees who had worked on the Caspian project 
in 1995 on the basis that the project work would be non-
union. Dufresne informed at least two O'Dovero employees 
who had worked in 1995 that the project would be entirely 
non-union because Peter O'Dovero was angry at the Union 
and particularly at Union representative Gray. The Union 
members refused to accept work on these terms, and the 
Caspian project was completed by Associated employees on a 
non-union basis.

 In response to the Union's filing of charges alleging, among 
other things, failure to bargain a successor contract and 
illegal work diversion, an Administrative Law Judge ("ALJ") 
found that O'Dovero and Associated were a single employer, 
that O'Dovero had ceased operations, and that various of 
petitioner's actions violated the Act, including unlawful diver-
sion of Caspian project work for anti-union purposes from 
O'Dovero to Associated in violation of s 8(a)(3) and (a)(1). 
The National Labor Relations Board ("Board") adopted the 
ALJ's decision except as to O'Dovero's operations. The 
Board found no cessation of operations, but only the contin-
ued diversion of work to non-union represented Associated 
employees.

 The court will set aside the Board's decision and order only 
if the Board " 'acted arbitrarily or otherwise erred in applying 
established law to the facts' at issue, International Union of 

Elec., Elec., Salaried, Mach. and Furniture Workers, 41 F.3d 
at 1536 (citations and internal quotation marks omitted), or if 
its findings are not supported by 'substantial evidence'. 29 
U.S.C. s 160(e), (f) (1988)." Plumbers and Pipe Fitters 
Local Union No. 32 v. NLRB, 50 F.3d 29, 32 (D.C. Cir. 1995). 
See also Elastic Stop Nut Div. of Harvard Ind., Inc. v. 
NLRB, 921 F.2d 1275, 1279 (D.C. Cir. 1990). Moreover, the 
court owes great deference to the Board's determination of an 
appropriate remedy for violations of the Act, setting aside 
that remedy only if the Board's remedy "is a patent attempt 
to achieve ends other than those which can fairly be said to 
effectuate the policies of the Act." Virginia Elec. & Power 
Co. v. NLRB, 319 U.S. 533, 540 (1943). See also Teamsters 
Local Union No. 171 v. NLRB, 863 F.2d 946, 957 (D.C. Cir. 
1988).

 II.

 Petitioner's challenges to the Board's findings for lack of 
substantial evidence do not merit extended discussion.

 Notably, petitioner does not challenge the Board's finding 
that Associated and O'Dovero are a single business enter-
prise. Rather, petitioner maintains that the Board and the 
Union were estopped from making a single employer argu-
ment in view of the Board's rejection in 1995 of a similar 
complaint by the Union, and in view of the Union's alleged 
twenty years of "knowledge of the O'Dovero-Associated rela-
tionship". Neither contention has merit. The 1995 decisions 
by the Board's Acting Regional Director and General Counsel 
not to pursue prosecution of the Union's 1995 charges were 
based solely upon the limited evidence then provided by the 
Union, and not upon independent investigation by the Board. 
Prosecutorial decisions by the Regional Director and General 
Counsel are not adjudications and have no preclusive effect 
on future actions of the Board. NLRB v. United Food & 
Commercial Workers Union, 484 U.S. 112, 125-26 (1987); 
Bryant & Stratton Bus. Inst. Inc. v. NLRB, 140 F.3d 169, 185 
(2d Cir. 1998); Ball Corp., 322 NLRB 948, 951 (1997). Peti-
tioner's waiver or estoppel argument, that the Union has long 

known of the single employer relationship between Associated 
and O'Dovero, is no less flawed because, as the ALJ pointed 
out, the existence of a single integrated enterprise does not 
alone constitute an unfair labor practice; there must be other 
evidence on which to base an unfair labor practice.

 Petitioner's challenge to the Board's finding that Peter 
O'Dovero unlawfully diverted pipe work on the Caspian pro-
ject in violation of s 8(a)(3) and (a)(1), also is meritless. See 
Laro Maintenance Corp. v NLRB, 56 F.3d 224, 228 (D.C. Cir. 
1995). See also NLRB v. Transportation Mgmt. Corp., 462 
U.S. 393, 395, 397-403 (1995); Wright Line, 251 NLRB 1083 
(1980). First, there was substantial evidence to show anti-
union motivation. Two witnesses, whom the ALJ credited, 
recounted statements by O'Dovero's supervisor on the Caspi-
an project that the project had "gone nonunion" because 
Peter O'Dovero was angry with the Union. Petitioner con-
cedes in the reply brief that there was substantial evidence 
that the statements were made. A third witness, also credit-
ed by the ALJ, recounted being told by James O'Dovero that 
Peter O'Dovero was angry at the Union because it had 
attempted to organize Associated's employees. In addition, 
the ALJ found "that the very fact that Peter O'Dovero and 
[the O'Dovero supervisor] gave differing reasons [for the 
diversion of pipe laying work] itself undermines [petitioner's] 
case on this issue." 2 See Southwest Merchandising Corp. v. 
NLRB, 53 F.3d 1334, 1340 (D.C. Cir. 1995).

 Substantial evidence thus supports the Board's conclusion 
that anti-union animus was a "motivating factor" in the 
Caspian work diversion. Indeed, petitioner's conflicting ex-

__________
 2 While Peter O'Dovero claimed that the change in crew was 
due to the fact that "[t]he job was tapering down"--"[w]e went from 
two crews to one crew and it was an Associated project to start with 
so ... on Associated projects we do give preference to Associated 
people," the supervisor claimed that the work was diverted because 
"we had problems with O'Dovero Construction [in 1995]", although 
the only problems he could identify involved Associated's employees 
and he agreed as to every O'Dovero employee about whom he was 
asked that the employee had performed well and was asked to 
return, albeit as an Associated employee.

planations for the reassignment of work hardly constitute the 
showing that it must make, namely that "the same action 
would have taken place even in the absence of the protected 
conduct". See Laro, 56 F.3d at 228, 229. That work was 
assigned to O'Dovero employees after the Union attempted to 
organize Associated, and after the Union had filed its 1995 
unfair labor practices complaint, that there might have been 
other, earlier opportunities for Peter O'Dovero to develop 
anti-union animus and does not demonstrate that Peter 
O'Dovero did not act on anti-union animus in diverting Caspi-
an project work to Associated employees.

 There also was substantial evidence that O'Dovero never 
ceased operations. The Board noted in view of the evidence 
of the single employer status of O'Dovero and Associated, see, 
e.g., Radio & Television Broadcast Technicians Local Union 
1264 v. Broadcast Services of Mobile, Inc., 380 U.S. 255, 256 
(1965) (per curiam), which finding petitioner does not chal-
lenge, that "it is not entirely clear what it means to say that 
one of them, but not the other, has ceased operations." In 
any event, Peter O'Dovero admitted that the corporate entity 
is "still in existence", "did not file papers of dissolution," and 
could resume a project "tomorrow" if it so chose. Other than 
evidence that discussions about dissolution of O'Dovero oc-
curred as early as 1994, petitioner can point to nothing that 
would support its distinction between existence and cessation. 
Petitioner's contention that the Board erred by failing to 
undertake a partial closing analysis under Textile Workers v. 
Darlington Mfg. Co., 380 U.S. 263 (1965), is unpersuasive 
inasmuch as that case involved a corporate liquidation and 
physical closing of a mill; nothing of the kind is shown here. 
That O'Dovero was not bidding on work or performing work 
misses the mark; O'Dovero's work was seasonal and per-
formed upon assignment by Associated.

 III.

 Turning to petitioner's challenge to the Board's remedial 
order, the Board directed that O'Dovero must resume opera-

tions inasmuch as there was no showing that it would be 
unduly burdensome to resume the work that it historically 
had done. The Board clarified, however, that nothing in its 
Order "prohibit[s petitioner] from abandoning any operations, 
or from declining to bid on projects, for legitimate business 
reasons." Peter O'Dovero, 325 N.L.R.B. No. 187, 1998 WL 
380989, at *5.

 Under s 10(c), the Board "has wide discretion in ordering 
affirmative action" to remedy the effects of unfair labor 
practices, Virginia Electric, 319 U.S. at 539. Thus, the court 
will decline to enforce the Board's remedial order only if the 
order represents "a patent attempt to achieve ends other 
than those which can fairly be said to effectuate the policies of 
the Act." Virginia Electric, 319 U.S. at 540; Teamsters 
Local Union No. 171, 863 F.2d at 957. A remedial order 
directing the resumption of operations cannot stand, however, 
where a company demonstrates that "compliance with the 
order is unduly economically burdensome." Teamsters Local 
Union No. 171, 863 F.2d at 957-58. See also Coronet Foods, 
Inc. v. NLRB, 981 F.2d 1284, 1288 (D.C. Cir. 1993); Lear 
Siegler, Inc., 295 N.L.R.B. 857, 861 (1989). While a determi-
nation of undue burden necessarily is case specific, courts 
have found an undue burden to exist where a plant was 
ordered reopened "at an estimated operating loss of several 
hundred thousand dollars to the company a year", Frito-Lay 
v. NLRB, 585 F.2d 62, 68 (3d Cir. 1978), or where a "substan-
tial capital outlay" would have been required of a small 
company with a "minimal profit margin." NLRB v. R & H 
Masonry Supply, Inc., 627 F.2d 1013, 1014 (9th Cir. 1980). 
Similarly, the Board itself acknowledged in Lear Siegler that 
requiring "an entity to reopen a demonstrably unprofitable 
facility", even where it could "offset losses from the reopened 
facility with profits from others ... might well be found to be 
unduly burdensome." 295 N.L.R.B. at 861.

 Petitioner contends that the Board abused its discretion in 
ordering O'Dovero to resume operations. In support of its 
contention, petitioner points to evidence that the compiled 
financial statements of O'Dovero prepared by Anderson, 
Tackman & Company, showed operating losses in 1993 

through 1996 of $20,367, $4,630, $32,398, and $97,689, respec-
tively. Consequently, petitioner claims, the decision was 
made to cease operations at the annual shareholders meeting 
in December 1995. From this evidence petitioner maintains 
that the Board is requiring the cross subsidization that it 
warned against in Lear Siegler, 295 N.L.R.B. at 861.

 The difficulty with petitioner's contention is not its theory 
but its deficiency of evidence to support its theory. As the 
Board explained, the operating losses shown in O'Dovero's 
financial statements have little meaning in view of the inter-
mingled and integrated operations of O'Dovero and Associat-
ed. The evidence of record does not isolate O'Dovero's losses 
in a sufficient manner. Some of O'Dovero's major expenses 
inure to the integrated company's benefit, such as rent being 
paid to another Peter O'Dovero company, and his wife's and 
son's salaries being paid by O'Dovero, yet much of the work 
that O'Dovero had performed in recent years was bid by 
Associated. Thus, it was impossible to tell whether on these 
projects the company as a whole lost money on the work that 
O'Dovero performed during the period in question, or wheth-
er the losses shown were more than offset by profits realized 
by Associated. Consequently, the financial statements do not 
establish, and no witness claimed, that the Company did not 
realize an overall profit on the work that O'Dovero per-
formed. Indeed, the accountants' telling qualification stated 
that their financial statements were prepared with "manage-
ment[ ] elect[ing] to omit substantially all of the disclosures 
and the statements of cash flows required by generally ac-
cepted accounting principles," and that those omissions 
"might influence the user's conclusions about [O'Dovero's] 
financial position, results of operations and cash flows." 
Moreover, the 1996 statement reflected losses when O'Dovero 
performed virtually no unit work.

 Even assuming the validity of petitioner's contention that 
O'Dovero has sustained operating losses for several years, 
petitioner still fails to show that the Board's order is unduly 
burdensome. Given the highly intermingled infrastructure of 
O'Dovero and Associated, which remained virtually un-
changed, as demonstrated by Peter O'Dovero's testimony that 

O'Dovero could resume operations "tomorrow", the Board 
could properly find that its resumption directive imposes no 
significant operational costs upon petitioner. Petitioner did 
not claim that resumption of prior bidding practices would 
entail any capital investment, or involve other financial com-
mitments, such as moving costs. Furthermore, the limiting 
language in the Board's order makes clear that O'Dovero may 
decline to bid on a particular project if it has a legitimate 
reason for doing so; what petitioner may not do is fail to bid 
on work for anti-union reasons. Contrary to petitioner's 
contention, the Board's order does not require it to resume an 
operation that it has already determined to be intolerably 
unprofitable. The Board simply found that petitioner had 
failed to show that its actions were impelled by a determina-
tion that it was incurring intolerable operating losses.

 Put otherwise, the Board's order requires no more than a 
return to the status quo ante with respect to "work assign-
ment decisions". See, e.g., Emhart Indus. v. NLRB, 907 F.2d 
372, 378 (2d Cir. 1990). Thus, if and when Associated enters 
into a contract that involves in whole or in part ground pipe 
work of the type that would have been performed by O'Dove-
ro's unionized employees prior to the unlawful diversion of 
work and O'Dovero's purported "cessation" of operations, 
then that work must be continued to be assigned to the 
unionized employees. The same would be true if O'Dovero 
were to enter into a contract; work under that contract could 
not be shifted to Associated's nonunion employees unless 
prior to the purported "cessation" of O'Dovero's operations 
such work would have been shifted for reasons unrelated to 
anti-union animus.

 Additionally, nothing in the Board's order would prevent 
the owners of O'Dovero from taking steps to bring about the 
dissolution of O'Dovero in a lawful manner. If the owners of 
O'Dovero conclude that O'Dovero and its bargaining unit type 
of work is an economic drain, and, therefore, formally dissolve 
O'Dovero, nothing in the Board's order would prevent Associ-
ated from performing non-O'Dovero type work under future 
contracts with non-union employees. So understood, the 
Board's order did not require petitioner "to engage in unprof-

itable operations. Petitioner having failed to show that the 
remedial order was unduly burdensome," it necessarily fol-
lows that the Board did not abuse its discretion in directing 
resumption of O'Dovero's operations.

 Accordingly, we deny the petition and order enforcement of 
the Board's order.