**Peter O'DOVERO d/b/a Associated Constructors, and O'Dovero Construction, Inc., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 98–1433.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 1999.

Decided Oct. 22, 1999.

---

Charles W. Gorham argued the cause and was on the briefs for petitioner.

Richard A. Cohen, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, and John D. Burgoyne, Acting Deputy Associate General Counsel. David S. Habenstreit, Attorney, entered an appearance.

Before: SENTELLE, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Petitioner Peter O'Dovero d/b/a Associated Constructors and O'Dovero Construction, Inc. appeals the decision and order of the National Labor Relations Board finding that it violated § 8(a)(1), (a)(3) and (a)(5) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158 (a)(1), (a)(3), and (a)(5), and directing that petitioner henceforth cease and desist from "[d]iverting work from one group of employees to another in order to discourage union activity," and "[r]esume bidding for jobs to be performed by unit employees under bidding practices as they existed prior to the unlawful diversion of union work." *Peter O'Dovero d/b/a Associated Constructors and O'Dovero Construction, Inc.*, 325 N.L.R.B. No. 187, 1998 WL 380989, at *5 (1998). Before the court, petitioner makes four claims of error: first, that the Board was precluded from making a single employer finding in light of a prior prosecutorial decision not to pursue such a union complaint and the union was estopped from bringing the instant case; second, the Board's finding that O'Dovero has not ceased its operations is unsupported by substantial evidence in view of the evidence that it was performing no work nor bidding on contracts and that discussions about dissolving O'Dovero began two years earlier; third,.that the Board's finding that work was diverted from O'Dovero to Associated elevates treatment of a union subcontractor and distorts the underlying con-

tractual relationship; and fourth, that the Board abused its discretion by imposing an unduly burdensome remedy, effectively forcing resumption of unprofitable operations. Only the latter contention requires some explication. Because the Board's findings are supported by substantial evidence in the record, and because the Board did not abuse its discretion in requiring resumption of the status quo pro ante, we deny the petition and order enforcement of the Board's order.[1]

## I.

Associated Constructors ("Associated") and O'Dovero Construction, Inc. ("O'Dovero") are family owned and run construction companies. Associated, founded in the 1980s, is owned entirely by Peter O'Dovero, while O'Dovero, established in the 1960s, is owned by Peter O'Dovero, his wife Lois, and his son James, who is president of O'Dovero. Historically, O'Dovero has performed work on Associated's projects, specializing in laying underground pipe. That work is performed by unionized employees, who are hired on an as needed basis during the construction season, which generally runs from mid-April to the end of November. O'Dovero has recognized the International Union of Operating Engineers, Local 324 ("the Union") since its incorporation, although the Union was not certified until 1993. Associated has never recognized the Union, although the Union has made attempts to organize its employees.

The instant case arises in connection with a project begun in April 1995 to replace underground water pipes in Caspian, Michigan. The heavy equipment work involved in laying underground pipe was assigned to O'Dovero. On several occasions before the job shut down in November, Craig Dufresne, job superintendent of the O'Dovero equipment operators, as well as supervisor of approximately ten Associated laborers, told the heavy equipment operators that the job was non-union, although the operators were then being paid union wages and receiving union benefits, and were paid as well for show-up as required under the collective bargaining agreement between the Union and O'Dovero. Because considerable pipe laying work remained to be done, Dufresne told the operators that the project would start up again when the weather broke.

In April 1996, shortly before O'Dovero's contract with the Union was to expire, Bill Gray, the Union's bargaining representative, asked James O'Dovero about bargaining the terms of a successor contract. Gray was informed that a new contract might not be possible because Peter O'Dovero was upset that the Union had tried to organize Associated's employees. On June 20, 1996, Gray was told that O'Dovero had decided to cease operations. Similar statements were made regarding Peter O'Dovero's anger at the Union by Dufresne, when he tried in the spring of 1996 to recruit O'Dovero employees who had worked on the Caspian project in 1995 on the basis that the project work would be nonunion. Dufresne informed at least two O'Dovero employees who had worked in 1995 that the project would be entirely non-union because Peter O'Dovero was angry at the Union and particularly at Union representative Gray. The Union members refused to accept work on these terms, and the Caspian project was completed by Associated employees on a non-union basis.

In response to the Union's filing of charges alleging, among other things, failure to bargain a successor contract and illegal work diversion, an Administrative Law Judge ("ALJ") found that O'Dovero

---

1. Petitioner does not challenge the Board's findings that petitioner violated § 8(a)(1) and (a)(5) by failing to bargain with the Union for a new contract and with respect to the diversion of work on the Caspian project, by making coercive statements regarding employees' decisions to join or to stay in the Union, and by dealing directly with Union represented employees. Accordingly, we affirm those findings. *See, e.g., Corson and Gruman Co. v. NLRB*, 899 F.2d 47, 50 n. 4 (D.C.Cir.1990).

and Associated were a single employer, that O'Dovero had ceased operations, and that various of petitioner's actions violated the Act, including unlawful diversion of Caspian project work for anti-union purposes from O'Dovero to Associated in violation of § 8(a)(3) and (a)(1). The National Labor Relations Board ("Board") adopted the ALJ's decision except as to O'Dovero's operations. The Board found no cessation of operations, but only the continued diversion of work to non-union represented Associated employees.

■ The court will set aside the Board's decision and order only if the Board "'acted arbitrarily or otherwise cired in applying established law to the facts' at issue, *International Union of Elec., Elec., Salaried, Mach. and Furniture Workers*, 41 F.3d at 1536 (citations and internal quotation marks omitted), or if its findings are not supported by 'substantial evidence'. 29 U.S.C. § 160(e), (f) (1988)." *Plumbers and Pipe Fitters Local Union No. 32 v. NLRB*, 50 F.3d 29, 32 (D.C.Cir.1995). *See also Elastic Stop Nut Div. of Harvard Ind., Inc. v. NLRB*, 921 F.2d 1275, 1279 (D.C.Cir.1990). Moreover, the court owes great deference to the Board's determination of an appropriate remedy for violations of the Act, setting aside that remedy only if the Board's remedy "is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). *See also Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 957 (D.C.Cir.1988).

## II.

Petitioner's challenges to the Board's findings for lack of substantial evidence do not merit extended discussion.

■ Notably, petitioner does not challenge the Board's finding that Associated and O'Dovero are a single business enterprise. Rather, petitioner maintains that the Board and the Union were estopped from making a single employer argument in view of the Board's rejection in 1995 of a similar complaint by the Union, and in view of the Union's alleged twenty years of "knowledge of the O'Dovero–Associated relationship". Neither contention has merit. The 1995 decisions by the Board's Acting Regional Director and General Counsel not to pursue prosecution of the Union's 1995 charges were based solely upon the limited evidence then provided by the Union, and not upon independent investigation by the Board. Prosecutorial decisions by the Regional Director and General Counsel are not adjudications and have no preclusive effect on future actions of the Board. *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 125–26, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987); *Bryant & Stratton Business Institute, Inc. v. NLRB*, 140 F.3d 169, 185 (2d Cir.1998); *Ball Corp.*, 322 NLRB 948, 951 (1997). Petitioner's waiver or estoppel argument, that the Union has long known of the single employer relationship between Associated and O'Dovero, is no less flawed because, as the ALJ pointed out, the existence of a single integrated enterprise does not alone constitute an unfair labor practice; there must be other evidence on which to base an unfair labor practice.

■ Petitioner's challenge to the Board's finding that Peter O'Dovero unlawfully diverted pipe work on the Caspian project in violation of § 8(a)(3) and (a)(1), also is meritless. *See Laro Maintenance Corp. v. NLRB*, 56 F.3d 224, 228 (D.C.Cir. 1995). *See also NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 395, 397–403, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983); *Wright Line*, 251 NLRB 1083 (1980). First, there was substantial evidence to show antiunion motivation. Two witnesses, whom the ALJ credited, recounted statements by O'Dovero's supervisor on the Caspian project that the project had "gone nonunion" because Peter O'Dovero was angry with the Union. Petitioner concedes in the reply brief that there was

substantial evidence that the statements were made. A third witness, also credited by the ALJ, recounted being told by James O'Dovero that Peter O'Dovero was angry at the Union because it had attempted to organize Associated's employees. In addition, the ALJ found "that the very fact that Peter O'Dovero and [the O'Dovero supervisor] gave differing reasons [for the diversion of pipe laying work] itself undermines [petitioner's] case on this issue." [2] *See Southwest Merchandising Corp. v. NLRB,* 53 F.3d 1334, 1340 (D.C.Cir.1995).

Substantial evidence thus supports the Board's conclusion that anti-union animus was a "motivating factor" in the Caspian work diversion. Indeed, petitioner's conflicting explanations for the reassignment of work hardly constitute the showing that it must make, namely that "the same action would have taken place even in the absence of the protected conduct". *See Laro,* 56 F.3d at 228, 229. That work was assigned to O'Dovero employees after the Union attempted to organize Associated, and after the Union had filed its 1995 unfair labor practices complaint, demonstrates only that there might have been other, earlier opportunities for Peter O'Dovero to develop anti-union animus and does not demonstrate that Peter O'Dovero did not act on anti-union animus in diverting Caspian project work to Associated employees.

 There also was substantial evidence that O'Dovero never ceased operations. The Board noted in view of the evidence of the single employer status of O'Dovero and Associated, *see, e.g., Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.,* 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d

789 (1965) (per curiam), which finding petitioner does not challenge, that "it is not entirely clear what it means to say that one of them, but not the other, has ceased operations." In any event, Peter O'Dovero admitted that the corporate entity is "still in existence", "did not file papers of dissolution," and could resume a project "tomorrow" if it so chose. Other than evidence that discussions about dissolution of O'Dovero occurred as early as 1994, petitioner can point to nothing that would support its distinction between existence and cessation. Petitioner's contention that the Board erred by failing to undertake a partial closing analysis under *Textile Workers v. Darlington Mfg. Co.,* 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), is unpersuasive inasmuch as that case involved a corporate liquidation and physical closing of a mill; nothing of the kind is shown here. That O'Dovero was not bidding on work or performing work misses the mark; O'Dovero's work was seasonal and performed upon assignment by Associated.

### III.

Turning to petitioner's challenge to the Board's remedial order, the Board directed that O'Dovero must resume operations inasmuch as there was no showing that it would be unduly burdensome to resume the work that it historically had done. The Board clarified, however, that nothing in its Order "prohibit[s petitioner] from abandoning any operations, or from declining to bid on projects, for legitimate business reasons." *Peter O'Dovero,* 325 N.L.R.B. No. 187, 1998 WL 380989, at *5.

 Under § 10(c), the Board "has wide discretion in ordering affirmative ac-

---

**2.** While Peter O'Dovero claimed that the change in crew was due to the fact that "[t]he job was tapering down"—"[w]e went from two crews to one crew and it was an Associated project to start with so ... on Associated projects we do give preference to Associated people," the supervisor claimed that the work was diverted because "we had problems with

O'Dovero Construction [in 1995]", although the only problems he could identify involved Associated's employees and he agreed as to every O'Dovero employee about whom he was asked that the employee had performed well and was asked to return, albeit as an Associated employee.

tion" to remedy the effects of unfair labor practices, *Virginia Electric,.* 319 U.S. at 539, 63 S.Ct. 1214. Thus, the court will decline to enforce the Board's remedial order only if the order represents "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric,* 319 U.S. at 540, 63 S.Ct. 1214; *Teamsters Local Union No. 171,* 863 F.2d at 957. A remedial order directing the resumption of operations cannot stand, however, where a company demonstrates that "compliance with the order is unduly economically burdensome." *Teamsters Local Union No. 171,* 863 F.2d at 957–58. *See also Coronet Foods, Inc. v. NLRB,* 981 F.2d 1284, 1288 (D.C.Cir.1993); *Lear Siegler, Inc.,* 295 N.L.R.B. 857, 861 (1989). While a determination of undue burden necessarily is case specific, courts have found an undue burden to exist where a plant was ordered reopened "at an estimated operating loss of several hundred thousand dollars to the company a year", *Frito-Lay v. NLRB,* 585 F.2d 62, 68 (3d Cir.1978), or where a "substantial capital outlay" would have been required of a small company with a "minimal profit margin." *NLRB v. R & H Masonry Supply, Inc.,* 627 F.2d 1013, 1014 (9th Cir.1980). Similarly, the Board itself acknowledged in *Lear Siegler* that requiring "an entity to reopen a demonstrably unprofitable facility", even where it could "offset losses from the reopened facility with profits from others ... might well be found to be unduly burdensome." 295 N.L.R.B. at 861.

■ Petitioner contends that the Board abused its discretion in ordering O'Dovero to resume operations. In support of its contention, petitioner points to evidence that the compiled financial statements of O'Dovero prepared by Anderson, Tackman & Company, showed operating losses in 1993 through 1996 of $20,367, $4,630, $32,398, and $97,689, respectively. Consequently, petitioner claims, the decision was made to cease operations at the annual shareholders meeting in December 1995. From this evidence petitioner maintains that the Board is requiring the cross subsidization that it warned against in *Lear Siegler,* 295 N.L.R.B. at 861.

The difficulty with petitioner's contention is not its theory but its deficiency of evidence to support its theory. As the Board explained, the operating losses shown in O'Dovero's financial statements have little meaning in view of the intermingled and integrated operations of O'Dovero and Associated. The evidence of record does not isolate O'Dovero's losses in a sufficient manner. Some of O'Dovero's major expenses inure to the integrated company's benefit, such as rent being paid to another Peter O'Dovero company, and his wife's and son's salaries being paid by O'Dovero, yet much of the work that O'Dovero had performed in recent years was bid by Associated. Thus, it was impossible to tell whether on these projects the company as a whole lost money on the work that O'Dovero performed during the period in question, or whether the losses shown were more than offset by profits realized by Associated. Consequently, the financial statements do not establish, and no witness claimed, that the Company did not realize an overall profit on the work that O'Dovero performed. Indeed, the accountants' telling qualification stated that their financial statements were prepared with "management[ ] elect[ing] to omit substantially all of the disclosures and the statements of cash flows required by generally accepted accounting principles," and that those omissions "might influence the user's conclusions about [O'Dovero's] financial position, results of operations and cash flows." Moreover, the 1996 statement reflected losses when O'Dovero performed virtually no unit work.

Even assuming the validity of petitioner's contention that O'Dovero has sustained operating losses for several years, petitioner still fails to show that the Board's order is unduly burdensome. Given the highly intermingled infrastructure of O'Dovero and Associated, which re-

mained virtually unchanged, as demonstrated by Peter O'Dovero's testimony that O'Dovero could resume operations "tomorrow", the Board could properly find that its resumption directive imposes no significant operational costs upon petitioner. Petitioner did not claim that resumption of prior bidding practices would entail any capital investment, or involve other financial commitments, such as moving costs. Furthermore, the limiting language in the Board's order makes clear that O'Dovero may decline to bid on a particular project if it has a legitimate reason for doing so; what petitioner may not do is fail to bid on work for anti-union reasons. Contrary to petitioner's contention, the Board's order does not require it to resume an operation that it has already determined to be intolerably unprofitable. The Board simply found that petitioner had failed to show that its actions were impelled by a determination that it was incurring intolerable operating losses.

Put otherwise, the Board's order requires no more than a return to the status quo ante with respect to "work assignment decisions". *See, e.g., Emhart Indus. v. NLRB,* 907 F.2d 372, 378 (2d Cir.1990). Thus, if and when Associated enters into a contract that involves in whole or in part ground pipe work of the type that would have been performed by O'Dovero's unionized employees prior to the unlawful diversion of work and O'Dovero's purported "cessation" of operations, then that work must be continued to be assigned to the unionized employees. The same would be true if O'Dovero were to enter into a contract; work under that contract could not be shifted to Associated's nonunion employees unless prior to the purported "cessation" of O'Dovero's operations such work would have been shifted for reasons unrelated to anti-union animus.

Additionally, nothing in the Board's order would prevent the owners of O'Dovero from taking steps to bring about the dissolution of O'Dovero in a lawful manner. If the owners of O'Dovero conclude that O'Dovero and its bargaining unit type of work is an economic drain, and, therefore, formally dissolve O'Dovero, nothing in the Board's order would prevent Associated from performing non-O'Dovero type work under future contracts with non-union employees. So understood, the Board's order did not require petitioner "to engage in unprofitable operations. Petitioner having failed to show that the remedial order was unduly burdensome," it necessarily follows that the Board did not abuse its discretion in directing resumption of O'Dovero's operations.

Accordingly, we deny the petition and order enforcement of the Board's order.